## Louisville & Nashville Railroad Company v. White's Administrator.

(Decided December 9, 1915.)

### Appeal from Shelby Circuit Court.

1. Railroads—Duty to Have Cars in Safe Condition to be Unloaded by Consignee.—When a carrier delivers a car to a consignee to be unloaded, it must have the car in a reasonably safe condition for the purposes for which it is intended to be used, and where a consignee who was in the car by invitation for the purpose of getting freight, was killed by the falling of house doors that had been placed in the car in a dangerous position, the company will be liable.

2. Railroads—Duty Owing to Consignee in Unloading Cars—Duty of Consignee.—The consignee who is invited to remove freight from a car is under no duty to inspect or examine the car or its contents for the purpose of discovering whether either of them is in safe condition. The full measure of his duty is to exercise ordinary care for his own safety; and in the absence of knowledge to the contrary, he may assume that the car is reasonably safe for the purposes for which he intends to use it.

WILLIS & TODD and BENJAMIN D. WARFIELD for appellant.

RALPH W. GILBERT and BEARD & PICKETT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This appeal is prosecuted from a judgment of the Shelby Circuit Court awarding the appellee five thousand dollars damages against the appellant for the death of Warren White.

The only ground relied on for reversal is that the trial court should have directed a verdict for the appellant on the ground that the negligence of the decedent was the proximate cause of the accident which resulted in his death.

The facts of the case are as follows: A carload of freight, contained in what is known as a box car, was shipped from Louisville to Shelbyville, Ky. In this car there were several bundles of ordinary house doors, all of them weighing about 1,100 pounds. These bundles of doors when loaded in the car at Louisville were set up on the end one bundle against the other, and against the side of the car, the bottoms of the doors resting on the floor of the car and the tops nearly reaching the roof of the car. After these doors had been so placed in the car a large quantity of other merchandise was also placed in the car, and this merchandise, or at least some of it, was piled up against the doors, thus preventing them from falling, as it appears they would have done if not protected by the merchandise. When the car reached Shelbyville and was placed on the siding for the purpose of being unloaded, the merchandise, or, at any rate, that part of it that was against the doors, had been taken out when the decedent, who was working for the consignee of the doors, went into the car by the invitation, if not request, of the station agent of the appellant, for the purpose of taking the doors out of the car; and just as he had commenced, or while he was in the act of removing them, the doors that were then unsupported by any merchandise fell on him, killing him instantly.

The action against the appellant by the administrator of decedent was rested on the ground that it was the duty of the appellant to have used ordinary care to have the doors in a reasonably safe condition to be unloaded by the decedent, and so if at the time he went into the car for the purpose of unloading them, it negligently failed to have the doors in a reasonably safe condition to be removed, and as a direct result of its negli-

gence in this respect the decedent, while in the exercise of ordinary care for his own safety, was struck and killed by the falling of the doors, his administrator was entitled to recover damages for his death.

That a railroad company may be held liable in damages for injuries caused by its failure to exercise ordinary care to keep its premises and cars to which it invites persons having business with it, in a reasonably safe condition for their use while there engaged in the business they have been invited or requested to attend to, has been announced by this court in more than one case.

In L. & N. R. R. Co. v. Freppon, 134 Ky., 650, Freppon, an employe of the Henderson Tobacco Extract Co., was injured by a defective door on a car of the railroad company while he was attempting to open the door for the purpose of getting coke out which had been consigned to his employer. Holding that under the facts of that case the railroad company was liable, the court said:

"When a carrier delivers a car to a consignor to be loaded, or a consignee to be unloaded, it must have the car in a reasonably safe condition for the purpose for which it is intended to be used. In the absence of an express agreement, the law will raise an implied contract to this effect, and, under and by virtue of this implied contract, a recovery for a breach of it may be had by any person injured while engaged in loading or unloading the car and exercising ordinary care for his own safety.

"The duties and obligations of a common carrier to the public are not suspended during the time that its cars are being used by its patrons for purposes of loading or unloading. When it delivers a car for this purpose and invites its customers to use it, it undertakes that the car is in a reasonably safe condition to be used for the purposes intended." To the same effect are L & N. R. R. Co. v. Burch, 155 Ky., 245, and Franklin's Admr. v. L. & N. R. R. Co., 155 Ky., 594.

The decedent was under no duty to inspect or examine the car or its contents for the purpose of discovering whether either of them was in safe condition. He had been invited to enter the car by the railroad company, and the full measure of his duty was to exercise ordinary care for his own safety. But, of course, if he saw a

danger he could not voluntarily or heedlessly go into it; because this would not be exercising ordinary care for his own safety. Likewise, if by his own acts he intentionally or negligently converted a safe place into one that he knew, or in the exercise of ordinary care should have known, was dangerous, the railroad company would not be liable, for the thing that caused the injury would be the act of the decedent and not the act of the railroad company.

We, therefore, come to a more careful consideration of the evidence for the purpose of ascertaining whether the falling of the doors and the resulting injury was due to the negligence of the railroad company or to the failure of the decedent to exercise ordinary care for his own safety.

There seems to be no serious dispute as to the fact that these bundles of doors, standing perpendicularly against the wall of the car, were liable to fall at any time when the merchandise piled against them was removed. When it was removed there was nothing to keep the doors from falling, as they were standing directly upright. Appreciating the fact that the position of the doors, standing as they were unprotected by merchandise, made the interior of the car unsafe for persons having the right to be there, the railroad company puts its claim for a directed verdict distinctly on the ground that the decedent, after the outside bundle of doors had been set out at the bottom several inches, so that the top of it leaned against the inside bundles, thereby preventing any of them from falling, voluntarily so moved the outside bundle as to change it from its leaning position, thus producing the dangerous condition that caused the doors to fall.

The evidence shows that some two or three hours before the decedent was killed a man named McGinnis went into the car. He said that after removing the merchandise that was against the doors, he saw that these doors were standing directly upright. That his attention was called to them by Lee, the station agent of the railroad company. Asked what Lee said, he answered: "Why, I moved those two bundles of sash around to the end of the two rows of doors, and Mr. Lee, as I let loose of the sash, holloed; 'Look out; the doors are falling!' Q. What were those doors doing at the time you caught them? A. They were falling. Q.

When you removed that sash, how long was it before the
doors began to fall? A. When I removed the sash I was
in front of the doors. Just as soon as I took the sash
out the doors began to fall, and Mr. Lee began to hollo
at me, and I caught them. Q. What did you do after
you caught the doors? A. I took the two front bundles
in each row and walked them out and leaned them against
the next bundles of doors. I did not do anything to
the other doors. I left the two front bundles about 18
inches out at the bottom, leaving the inside bundles of
doors standing upright as they were. Q. Who assisted
you in moving out these two front bundles? A. Mr.
Lee. Q. When you and Mr. Lee walked out the two front
bundles in each row of doors, what was there to show
the position that the back doors were in? A. There
wasn't anything. Q. What was there in the doors or
about the position of the doors to give notice to a per-
son out in the car that the back bundle of doors were
setting at a different angle from the front bundles of
doors, if anything? A. Any one setting or rather stand-
ing in between the two car doors could see at what angle
the other doors were setting. Q. Now, a person stand-
ing in front of the doors, in the car, what was there
that he could see, that would show that the back doors
were at a different angle from the front doors? A. Noth-
ing. Q. You paid no more attention to the doors after
you did that? A. No, sir. Q. You regarded the doors
in that position as safe, did you? A. Yes, sir.''

J. A. Abraham, who was in the car that morning be-
fore the decedent was killed, and before McGinnis moved
the doors as stated by him, testified as follows: ''Q. Did
you have occasion to pass the doors and notice the po-
sition of them, where they were setting? A. Yes, sir.
Q. I will get you to state to the jury whether or not your
attention was attracted to the doors by Sid Smith, the
Louisville & Nashville porter, and were you warned to
be careful, that the doors would fall on you? A. Yes,
sir. Q. What did Sid Smith, the porter, say to you with
reference to the doors? A. I went into the end of the
gangway to look for some goods that I had a bill of lad-
ing for, and as I started to pull one box out of the way,
he said: 'Mr. Abraham, don't you see those doors shak-
ing; they will fall on you and kill you.' Q. With refer-
ence to the side of the wall of the car, how were the doors
placed in the car? A. They were straight up, absolutely

straight up from the floor to the ceiling. Q. At the time you were there, the front bundles had not been moved out? A. No, sir. They were standing solid against the wall."

John A. Lee, the station agent of the company, who was the only person in the car with the decedent at the time of the accident, testified as follows: "Q. Did you see him when the doors fell upon him? A. Yes, sir. Q. Where were you standing? A. I was six or eight feet from the doors, in the other end of the car. Q. What were you doing at the time? A. I was straightening some boxes out. Q. What was Mr. White doing at the time the doors fell upon him? A. He was standing in the car with his side to the doors and with his face towards me. Q. What was he in the act of doing? A. He was just standing there waiting for Sid Smith to come back. Q. Standing still? A. Yes, sir. Q. When the doors struck Mr. White, I will ask you whether or not he fell to the floor of the car? A. No; the doors fell against him and knocked him over to the other side of the car. Q. I will ask you whether or not you and Mr. McGinnis walked out any of the bundles of doors? A. We did. Q. How many? A. Two. Q. What was done with them when they were walked out? A. Well, all of these doors were leaned up against the wall of the car. We walked out the front bundles to give them a little more lean, and then leaned them back against the other doors. Q. How long was that before Mr. White came to the car? A. Between three and four hours. Q. I will ask you whether or not Mr. McGinnis removed any of the freight from around the doors on the floor; and, as he did so, what, if anything, did you say to him about the doors being about to fall? A. I observed that the doors were tottering and leaning over towards him. Q. Who caught them and prevented them from falling? A. I think Mr. McGinnis and myself both got hold of the doors, walked them out and leaned them back. Q. Just as the doors were in the act of falling, what did you say to Mr. White? A. I holloed to Mr. White that the doors were falling. Q. That was too late then to protect him? A. Yes, sir."

He further said that shortly after the decedent came into the car he said: " 'John, I will stay here and help Sid, the porter, to truck and put these doors in the ware-room.' There was a lot of soap in this end of the car, and while they were unloading that freight, Sid went out

'of the wareroom with a load of soap. White, when he got through, walked these bundles of doors out and set them upon end and turned around in this position. He got tired of holding that bundle of doors and turned around and walked it back and leaned it against these doors. He got tired of waiting for Sid Smith to come back. He was standing there facing this way, with his side to those doors when they fell over. Q. Mr. Lee, state to the jury what caused those doors to fall? A. Removing the first bundle and not putting it back in the position it was and failing to give it as much lean as it had before, that caused the bundles to fall over and kill Mr. White.''

It appears from the evidence of Lee that the decedent took hold of the outside bundle of doors that McGinnis had moved out at the bottom and leaned up against the other bundles for the purpose of taking it out of the car first, but that getting tired of holding it while waiting for Sid Smith, the porter, to come back, he put it back against the other doors without setting it out at the bottom as far as McGinnis had, and when he did this the doors at once fell. There is no evidence whatever that Lee gave any notice or warning to the decedent of the danger that the doors might fall or that the bundle of doors he had hold of should be set out at the bottom, or that any other precaution should be taken to prevent them from falling. Nor is there any evidence that the decedent knew that the bundle of doors he took hold of had been set out at the bottom by McGinnis for the purpose of keeping the doors from falling, or that he knew or could have known from the position in which he was standing that the bundle of doors he took hold of was setting out at the bottom several inches from the other doors to keep them from falling.

Lee, however, did know the danger to be anticipated from the falling of these doors, and why the outside bundle had been moved out from the other doors at the bottom, and it was clearly his duty, when he saw decedent take hold of this leaning bundle of doors to have given him some notice of the danger or warning that the doors would fall if he was not careful.

It should further be kept in mind that White was not killed by the bundle of doors which he took hold of and moved, because not only this bundle, but several other bundles of doors back of this one that had never been

touched by him and that were standing perpendicularly against the wall of the car fell on him.

The decedent had a right to assume, in the absence of any knowledge to the contrary, that the doors were in such a position as that they would not fall on him. In other words, he had a right to assume that the place was reasonably safe for the use to which he was going to put it and for the purposes for which he went in the car. If he had looked at the edges of the bundles of doors from a point between the car doors, he would probably have discovered the fact that the outside bundle of doors had been set out at the bottom, and with this knowledge might have been charged with notice that it was set out for the purpose of keeping the other doors from falling. But there is no evidence that he was at any time in such a position in the car as that he could or did see the space between the outside bundle and the other ones.

So that the only reasonable inference from all of this is that the decedent was entirely ignorant of the danger of these doors falling, and also ignorant of the reason why the outside bundle had been moved out at the bottom, if, indeed, he knew this bundle had been moved out. The further reasonable inference is that these doors were put in the car in a dangerous position, and when the car arrived at Shelbyville the danger, that had been for the time removed by the piling of merchandise against the doors, appeared as soon as this merchandise was removed, and the safety of the place was only temporarily secured when the outside bundle was moved out at the bottom by McGinnis and Lee.

It is, however, contended by counsel for the railroad company with great confidence that it was "decedent himself who rendered the position of the doors unsafe at the time he was killed, and that it was his own act that was solely responsible for his untimely death." But we do not find ourselves able to agree with counsel in this assumption. It cannot fairly be said that the decedent by his own act intentionally or negligently converted a safe place into one that he knew might be dangerous, or that he voluntarily or heedlessly created the danger that destroyed his life, or that in handling or going about these doors he failed to exercise ordinary care for his own safety.

We are not disposed to question the correctness of the principle of law announced in the cases of Kasey's

Admr. v. L. H. & St. L. Ry. Co., 124 S. W., 380; George-town Telephone Co. v. McCullough's Admr., 118 Ky., 182; L. & N. R. R. Co. v. Keiffer, 132 Ky., 419, and Logan v. C. N. O. & T. P. Ry. Co., 139 Ky., 202, that if an original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission, the injury shall be imputed to the last wrong as the proximate cause; but it is not controlling in the case we have.. The intervening act of the decedent in moving this outside bundle of doors, or in not putting it back exactly in the condition he found it, to which it is sought to attribute his death, was not a wrongful or negligent act or omission. The decedent went into the car for the purpose of removing these doors, and in performing the duty for which he was there, was not guilty of any act of omission or commission that could put upon him as a matter of law the consequences arising from the negligence of the railroad company in failing to furnish him a reasonably safe place.

We think the court properly submitted the case to the jury, and that the evidence supports the verdict. Wherefore, the judgment is affirmed.