963 F.2d 144
 Benjamin Franklin RECTOR and Janice M. Rector, Plaintiffs-Appellants,
v.
GENERAL MOTORS CORPORATION and Federal-Mogul, Inc.,
Defendants-Appellees,
Eagle Expediting, a subsidiary of Gravel Trucking Company, Defendant.
 No. 91-5624.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 26, 1992.
Decided May 6, 1992.
 
 James P. Jones (argued and briefed), Centerville, Ohio, Thomas Lee Gentry, Harrodsburg, Ky., Katherine L. Billingham (briefed), Centerville, Ohio, for plaintiffs-appellants.
 Linda M. Hopgood (argued and briefed), Geralds, Moloney & Jones, Linsey W. West (argued and briefed), Woodward, Hobson & Fulton, Louisville, Ky., for defendants-appellees.
 Before: JONES, GUY and BATCHELDER, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Plaintiffs, Benjamin Franklin Rector and his wife, Janice, appeal the entry of summary judgment in favor of defendants, Federal-Mogul, Inc. and General Motors Corporation ("GM"), in this personal injury action arising out of Benjamin Rector's fall while handling cargo in his employer's tractor trailer. For the reasons that follow, we affirm.
 
 
 2
 * The injury giving rise to this dispute occurred on the morning of January 10, 1989 in Harrodsburg, Kentucky.[1] Benjamin Rector, acting in his capacity as an employee of Rite Trucking Lines, slipped and fell on small automotive gears (also known as "races"), which had been packaged in oil and which had spilled to the floor of a tractor trailer he had driven to Harrodsburg from Dayton, Ohio. Rector experienced severe pain upon his fall, and the accident caused permanent injury to his lower back.
 
 
 3
 Defendants' involvement in this matter arises as follows. The gears on which Rector injured himself were manufactured and packaged by Federal-Mogul. On January 4, 1989, Federal-Mogul shipped the gears from Gallipolis, Ohio to GM's Buick Motor Division in Flint, Michigan via Eagle Expediting, a third-party carrier not a party to the instant appeal. The gears were packed in oil and loaded into five boxes, which were then placed on a skid. Pursuant to Federal-Mogul's usual practice, the skid and boxes were then shrink-wrapped eight times.[2] The package was subsequently loaded onto the Eagle truck by means of a forklift. The driver of the Eagle truck requested that the skid on which the boxes were packaged be secured by two-by-four boards placed into the truck and hammered into the front and back of the skid.
 
 
 4
 During the course of their journey to the GM plant in Michigan, the gears apparently shifted and fell out of their boxes. On January 5, 1989, the gears arrived at GM's Flint plant. Due to the damaged and dirty condition of the spilled gears, GM rejected them as unusable, and Federal-Mogul agreed to accept their return. Because the truck that had delivered the gears was not returning to Gallipolis, GM agreed to allow the gears to remain at its loading dock until a truck belonging to Rite Trucking could transport them back to Federal-Mogul. On January 9, 1989, the gears were loaded onto a Rite truck. Before the gears were loaded, GM did not shrink-wrap the gears.
 
 
 5
 That evening, the Rite truck carrying the gears arrived at the Rite Trucking terminal in Dayton, Ohio. Terminal manager John Mullins then directed two Rite employees to transfer the gears to another Rite truck for further shipping. The record does not indicate whether the employees merely moved the gears to another trailer, or also repackaged the gears in some manner.
 
 
 6
 Rector was assigned to transport this second trailer through Harrodsburg, where he was to obtain additional cargo at another warehouse, then proceed to Gallipolis. Rector did not check the contents of the trailer before departing from Dayton, nor was he aware that the cargo consisted solely of the rejected gears.
 
 
 7
 Upon his arrival in Harrodsburg, Rector discovered the spilled gears. Employees at the warehouse in Harrodsburg told Rector that if he repackaged the gears, they would shrink-wrap the load to prevent further spillage during the remainder of the journey. As he repacked the gears, Rector slipped on either the spilled gears or the oil in which they had been packaged.
 
 
 8
 On January 9, 1990, the Rectors filed this personal injury action in state court against Federal-Mogul and GM. The action was subsequently removed to the United States District Court for the Eastern District of Kentucky.
 
 
 9
 Defendants filed a motion for summary judgment, to which plaintiffs responded. On April 12, 1991, the district court issued an order entering summary judgment in favor of defendants. The Rectors subsequently filed this timely appeal.
 
 II
 
 10
 We review a district court's grant of summary judgment de novo. Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 534 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990). A federal court of appeals reviews de novo a district court's determination of state law. Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). In applying state law, this court follows the law of the state as announced by that state's supreme court. Miles v. Kohli & Kaliher Assocs., 917 F.2d 235, 241 (6th Cir.1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." Id.
 
 
 11
 Plaintiffs devote the majority of their brief to the claim that defendants owed Rector a duty to load the gears for shipment in a reasonably safe manner, and that their breach of that duty proximately caused his injury. Under Kentucky law, " '[a]ctionable negligence consists of a duty, a violation thereof, and consequent injury. The absence of any one of the three elements is fatal to the claim.' " M & T Chems. v. Westrick, 525 S.W.2d 740, 741 (Ky.1975) (quoting Illinois Cent. R.R. v. Vincent, 412 S.W.2d 874, 876 (Ky.1967)). As a general rule, duty is defined as the exercise of ordinary care to prevent foreseeable injury from occurring to another person. Id.
 
 
 12
 Neither party directs this Court to any precedent from the highest court of Kentucky that addresses whether a shipper owes a duty to a common carrier or its employees to load cargo into the carrier's vehicle in a reasonably safe manner. While the case law nationally on this issue is sparse, it appears that, "[a]s a general rule, the carrier has the primary duty to load and unload goods or inanimate freight shipped in less than carload lots, and is liable for damages resulting from its failure to perform that duty in a proper manner." 13 Am.Jur.2d Carriers § 319 (1964) (emphasis added) (footnote omitted); see also Bonifield Bros. Truck Lines v. Edwards, 450 S.W.2d 240, 243 (Ky.1970) (holding that one who accepts goods, whether from a shipper or another carrier, has duty of ordinary observation to determine whether goods were loaded properly); J.A. Bryant, Jr., Annotation, Liability, Because of Improper Loading, of Railroad to Consignee or his Employee Injured While Unloading Car, 29 A.L.R.3d 1039, 1054-55 (1970) ("As a general rule, the carrier by rail has the duty of loading and unloading shipments consisting of less than carload lots and is liable for negligence in doing so."). In Louisville & N.R.R. v. White's Adm'r, 167 Ky. 244, 180 S.W. 353 (1915) the Kentucky Court of Appeals, the Commonwealth's highest court, held that whenever a carrier delivers a car to be unloaded by the consignee of the cargo, the carrier is under a duty to load the cargo in such a way as to leave the cargo in a reasonably safe condition to be unloaded. Id. 180 S.W. at 353. If a common carrier owes such a duty to a consignee, it follows that the carrier, rather than the shipper, owes such a duty to its own employees. Thus, the duty to load the cargo in a reasonably safe manner lies with Rector's employer, Rite Trucking, rather than with defendants.[3]
 
 
 13
 We recognize that courts have, in certain circumstances, found a shipper liable to a consignee of goods for injuries resulting from unloading where the shipper undertook the loading of the cargo. See Annotation, Shipper's Liability to Consignee or his Employee Injured While Unloading Car Because of Improper Loading, 35 A.L.R.2d 609, 609 (1954); 13 Am.Jur.2d Carriers § 320. This rule makes sense as a policy matter, as the consignee in such a situation cannot reasonably be expected to know whether the goods were loaded in a safe or reasonable manner prior to shipping. Similarly, it would be illogical to hold a carrier liable to a consignee of the goods where it was the shipper, rather than the carrier, who had exclusive control over the manner in which the goods were loaded.
 
 
 14
 This rule, however, does not support imputing to a shipper in the position of defendants the same duty to the common carrier or its employees as a shipper might owe to a consignee in the aforementioned circumstances. There is no evidence in the record which would establish that either defendant had exclusive control over the loading of the gears. On the contrary, the undisputed evidence in the record shows, as noted above, that the carrier, Rite, had loaded the gears into the truck which Rector drove, that Rector did not inspect the load before he drove the truck from Dayton to Harrodsburg, and that Rector was injured only after making that trip. Thus Rite, unlike a consignee, was in a position to know the manner in which the cargo in its truck had been loaded. Furthermore, it is fully within the purview of a common carrier in such circumstances, again in contrast to a consignee, to place rules and restrictions on how the shipper may load cargo into its vehicles. Given these circumstances, we believe that, under Kentucky law, a shipper would not be held liable for the injuries of a common carrier's employee sustained while the employee unloaded the shipper's goods from the common carrier's vehicle where it was not shown that the shipper had exclusive control over loading the cargo.
 
 
 15
 Defendants also point out that federal regulations state that "the driver of a truck or truck tractor must ... [a]ssure himself that" his vehicle's cargo is properly distributed and adequately secured. 49 C.F.R. § 392.9(b) (1991). While not dispositive, this regulation is indicative of the proper allocation of duty as between a common carrier and a shipper for the proper loading of goods.
 
 
 16
 Finally, although plaintiffs rely on Carr v. Merrimack Farmers Exchange, 101 N.H. 445, 146 A.2d 276 (1958) for support, that case is inapposite. In Carr, the New Hampshire Supreme Court held that a shipper may have a duty to inspect the loading of its wares by a common carrier to ensure against unreasonable risk of bodily harm to those travelling on the highways. Id. 146 A.2d at 278-79. Such a rule is supportable on the ground that highway travellers have no power to inspect or ensure against faulty and dangerous loading. Here, by contrast, the injury occurred to an employee of the carrier itself, and there is no evidence in the record indicating that someone other than the common carrier bore the responsibility for loading the goods in a reasonably safe manner. In sum, we find that plaintiffs have failed to establish that the defendants owed a duty to Rector to load the gears in a reasonably safe manner into the Rite truck.[4]
 
 III
 
 17
 Plaintiffs also argue that, even if defendants owed no duty to Rector to load the gears in a safe manner, both defendants had a duty to package the gears in a reasonably safe manner. As an initial matter, we question whether Rector's injury can fairly be said to have resulted from negligent packaging, rather than from the negligent loading of the gears. Rector does not contend that the packaging was inherently dangerous, but rather, that the packaging contributed to the unsafe manner in which the gears were loaded. Nevertheless, we conclude that the district court correctly entered summary judgment in favor of defendants on this theory as well.
 
 
 18
 Addressing first Rector's claim against Federal-Mogul, Rector relies principally upon his own affidavit, in which he claims that he had previously observed the forklift, with which Federal-Mogul loaded the gears, damage the shrink wrap surrounding the boxes. Rector offers no evidence, however, that the packaging of the gears in question was in any way defective, or that Federal-Mogul's packaging process was negligent or deviated from customary industry practice. Moreover, Federal-Mogul offered uncontradicted testimony regarding the manner in which the gears at issue were loaded onto the Eagle truck, and Rector fails to offer any proof suggesting that this method was negligent. Accordingly, we agree with the district court that "plaintiffs' bare allegations that Federal Mogul was somehow negligent are not sufficient to overcome a motion for summary judgment." J.A. at 143.
 
 
 19
 We also affirm the district court's conclusion that GM did not have a duty to repackage the gears after rejecting them upon their arrival in Flint. It is undisputed that GM never accepted the gears, but merely agreed to let them stand on its dock until a Rite truck could transport them to back Federal-Mogul. It is also undisputed that GM did not have the facilities to repackage the gears. Finally, plaintiffs have not directed our attention to any case indicating that a consignee who rejects goods has a duty to repackage the goods prior to their shipment back to the consignor. Taken together, we believe these factors support the district court's entry of summary judgment in favor of GM.
 
 IV
 
 20
 For the foregoing reasons, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 Because plaintiffs appeal from an adverse summary judgment order, the following statement of facts views the evidence, and draws all reasonable inferences therefrom, in a light most favorable to plaintiffs. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); Curry v. Vanguard Ins. Co., 923 F.2d 484, 485 (6th Cir.1991)
 
 
 [2]
 Shrink-wrapping is a packaging process whereby a machine wraps an entire package from top to bottom in a strong plastic wrapping material
 
 
 [3]
 For purposes of the present appeal only, we assume, without deciding, that GM was a "shipper" of the gears despite the fact that it rejected them and merely agreed to let them remain at its Flint facility until they could be shipped back to Federal-Mogul
 
 
 [4]
 Given our conclusion that defendants did not owe a duty to Rector, we need not address the district court's contention that Rite's transfer of the gears constituted an intervening cause absolving defendants of liability