NATIONAL RIFLE ASSOCIATION OF AMERICA, Plaintiff–Appellant,

v.

HANDGUN CONTROL FEDERATION OF OHIO, et al., Defendants–Appellees.

No. 92–4076.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1993.

Decided Feb. 1, 1994.

Richard E. Gardiner, National Rifle Ass'n of America, Washington, DC (argued and briefed), for plaintiff-appellant.

Harry T. Sigmier, William H. Baughman, Jr. (argued), Raymond S. Ling (briefed), Thomas C. Buford, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for defendants-appellees.

Before: MERRITT, Chief Judge; JONES, Circuit Judge; and CELEBREZZE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

The National Rifle Association of America ("NRA") appeals from the summary judgment that the district court granted for the Handgun Control Federation of Ohio ("HCF") in this copyright infringement action. The district court ruled that the NRA could not copyright the three-page list of Ohio legislators at issue here. We affirm, holding that HCF has made "fair use" of the list under the copyright statutes and therefore cannot be held liable.

### I.

The NRA is a New York-based non-profit corporation that lobbies officials and educates the public in support of the ownership of firearms. HCF is also a non-profit organization and engages in similar activities, but toward a goal opposing that of the NRA.

On May 5 and June 7, 1989, the NRA sent short letters (two pages in May and one page in June) to its members urging opposition to two gun control bills pending before the Ohio legislature that provided for the ban of certain assault rifles and for waiting periods before gun purchases. Attached to each newsletter was a three-page listing of Ohio state legislators. One page lists the thirty-three members of the Ohio Senate along with their district numbers, their home cities, and their phone numbers both in their districts and in Columbus. An asterisk was placed before each of the eight members of the Senate Judiciary Committee. The other two pages contain the same information for a list of the ninety-nine members of the Ohio House of Representatives, with asterisks placed before the nineteen members of the House Judiciary and Criminal Justice Committee. Below the list of representatives was one paragraph of text, reading:

> Those 19 State Representatives marked with an asterisk (*) serve on the House Judiciary and Criminal Justice Committee to which H.B. 372/H.B. 483 has been referred. It is extremely important, especially if you are one of their constituents,

to contact their office opposing H.B. 372/H.B. 483. Address letters to your State Representative as follows: The Honorable ————; Ohio House of Representatives; State House; Columbus, Ohio 43266–0603.

J.A. at 280. A similar paragraph on the senate page explained the asterisks by the senators and urged members to contact them.

On June 14, 1989, HCF mailed a ten-page newsletter to about 200 of its members, attempting to arouse support for the same House bill the NRA opposed. The newsletter began with a page briefly explaining the pending bill and urging the writing of letters to several major Ohio newspapers, whose addresses were provided. Seven other pages provided detailed information about types of guns, the effect of gun control legislation, and other states' related gun laws. Pages eight and nine of the newsletter contain a two-page list of Ohio representatives, which HCF admits was photocopied from one of the NRA mailings, which HCF received. The block of text at the bottom of the list was copied, except that a few words, including the word "opposing," were blocked out.

On July 27, 1989, the NRA filed for and received copyright protection for their earlier newsletters.[1] The NRA filed the complaint in this action on May 2, 1990, alleging that HCF copied the NRA's compilation of information concerning the members of the Ohio legislature and published it in its newsletter in violation of the NRA's exclusive copyright under the Copyright Act of 1976, 17 U.S.C. §§ 101–810.

On September 2, 1992, the district court granted summary judgment to the defendant. The court held that the NRA's list of the Ohio representatives could not be copyrighted because the selection and arrangement of the information was "mechanical and routine." J.A. at 16. Even if the material was copyrightable, the court held, the defense of "fair use" would bar any damage recovery. *Id.* Therefore, the court saw no

---

1. We note that 17 U.S.C. § 412 allows damages to be received for copyright infringement, so long as the registration for the copyright occurs within three months of the publication of a work. Because the NRA registered within this period, it is not blocked from receiving damages by the fact that it did not file for the copyright until after HCF sent out its newsletter.

reason to go to trial and dismissed the case. The NRA now appeals.

■ We review a grant of summary judgment *de novo. Rector v. General Motors Corp.*, 963 F.2d 144, 146 (6th Cir.1992). The question on review of a summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

## II.

■ Copyrights provide an incentive for the creation of works by protecting the owner's use of his or her intellectual creation, allowing creators to reap the material rewards of their efforts. However, because not every use of a work undermines this underlying rationale of copyright law, and because some uses of copyrighted works are desirable for policy reasons, the courts have long held that many uses of a copyrighted work do not infringe upon the copyright. Codifying these longstanding "fair use" principles, Congress in the 1976 Copyright Act laid out 17 U.S.C. § 107, which reads:

[T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The four factors enumerated are especially relevant to the determination of whether fair use occurred, but they are not meant to exhaust the possible considerations. *Harper & Row Publishers v. Nation Enter.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985). Likewise, the purposes listed in the preamble are illustrations of the sorts of uses likely to qualify as fair uses rather than an exclusive list. *Pacific and Southern Co. v. Duncan*, 744 F.2d 1490, 1494–95 (11th Cir. 1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985).

■ We have no hesitation in finding a fair use here, for all the factors point in that direction. Though not conclusive, the fourth factor—dealing with effect on market share—is "the single most important element of fair use." *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233. This factor is generally demonstrated by a showing that the purpose or character of the use was commercial. In *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984), the Court explained that whether an activity is commercial sets a presumption regarding which way the fourth factor points in a fair use analysis:

[A]lthough every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter. A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.... What is necessary is a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists. If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.

HCF's use of the NRA legislator list was noncommercial. HCF, a non-profit organization, made no attempt to sell the list, which in any event contains information so readily available that it is doubtful it could be profitably sold. HCF used the list only to further its own lobbying goals. It is also difficult to see how the use could harm the NRA's "market." HCF only sent the information to about 200 members, which could not be a particularly damaging distribution. HCF's use of the list, if it did anything, helped *create* a market for the NRA, as citizens on one side of a controversial issue presumably feel more need to engage in political activity if citizens on the other side of the issue are active. This, in fact, is the apparent reason why the NRA sent out its newsletters in the first place, which began: "URGENT! CALL TO ACTION! Anti-gunners in the Ohio General Assembly have launched an all-out attack on your right to keep and bear arms." J.A. at 276. There presumably is more need for the NRA's list if their opponents' activities become more vigorous.

■ The publication here may be compared with the publication of an original list of information by one of two competing magazines. In such a case, the copying and publication of the list by the competitor would be presumptively unfair and an infringement, for it would reduce the market for the copyright-holding magazine. This contrast with commercial activity helps show that the purpose and character of HCF's use is far removed from that which the copyright law centrally protects and instead falls within the realm of the designated fair use purposes. The document was used primarily in exercising HCF's First Amendment speech rights to comment on public issues and to petition the government regarding legislation. The scope of the fair use doctrine is wider when the use relates to issues of public concern. *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1050 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Taken as a whole, the HCF newsletter also served an educational purpose, given the considerable information contained within the mailing re-

garding guns and gun legislation. Also, there is no evidence of bad faith on the part of the HCF person who compiled the mailing. *Cf. Fisher v. Dees*, 794 F.2d 432, 436–37 (9th Cir.1986) (no bad faith which could preclude application of the fair use doctrine).

The other factors also support the conclusion that this was a fair use, particularly the second factor, the nature of the copyrighted work. The list in the NRA newsletter is almost entirely factual, and "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232. As HCF amply shows us, lists containing similar facts are readily available. *See* J.A. at 285–329. Regarding the third factor, although HCF used the entire House of Representatives address list, it did not use the remainder of the copyrighted newsletter, which included a Senate list and a letter to NRA members regarding the pending legislation. This letter contained most of the "originality" in the document. For purposes of the second and third factors, one might contrast the list with the HCF's seven pages of detailed analysis of gun legislation, gun types, and related legislation from other states. Mainly in question-and-answer form, those pages provide many facts and opinions in a fairly creative manner. Assuming these pages were copyrighted, if they were photocopied by someone else, their nature and substantiality would weigh on the side of an infringement rather than of a fair use.

### III.

For the above reasons, we hold that HCF made fair use of the NRA legislator list under 17 U.S.C. § 107. Because we so hold, we need not reach the HCF's argument that the NRA document contained so little originality that it could not be copyrighted in the first place.[2] The grant of summary judgment in favor of the defendant is therefore

**AFFIRMED.**

---

**2.** While facts cannot be copyrighted, original      compilations of facts may be. The parties dis-

pute whether the NRA's document contained enough originality to be copyrightable under *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). *Feist* held that a "white pages" phone directory was not original enough to be copyrighted because it was "so mechanical or routine as to require no creativity whatsoever." *Id.* at 361, 111 S.Ct. at 1296.