25 F.3d 1050
 5 NDLR P 454
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Merrilu TEXLER, Plaintiff-Appellant,
v.
COUNTY OF SUMMIT BOARD OF MENTAL RETARDATION AND
DEVELOPMENTAL DISABILITIES, Defendant-Appellee.
 Nos. 92-3205, 92-3807 and 92-3758.
 United States Court of Appeals, Sixth Circuit.
 June 8, 1994.
 
 Before: MARTIN, NORRIS, and DAUGHTREY, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 Merrilu Texler contends that she suffers from a condition known as multiple chemical sensitivities. She brought suit claiming that her employer, the County of Summit Board of Mental Retardation and Developmental Disabilities, discriminated against her because of her handicapped condition and retaliated against her for filing charges of discrimination with administrative agencies, in violation of federal and state law. Texler also brought pendent state claims for negligent and intentional infliction of emotional distress, and assault and battery. She now appeals the district court's: (1) grant of the Board's motion for a directed verdict on the retaliation claim; (2) failure to rule that she was handicapped within the meaning of applicable federal law; (3) grant of the Board's motion for summary judgment with respect to her claim for intentional infliction of emotional distress; and (4) taxing of $4,136.90 in costs to her. For the following reasons, we affirm the judgment of the district court.
 
 
 2
 * In February 1977, Texler began working for the Board, which provides education and training for mentally retarded and developmentally disabled citizens of Summit County, Ohio, and maintains offices in the Akron Training and Work Center. Texler's initial responsibilities included on-the-job field training of clients, and training of other staff members. According to Texler, in 1983 she began experiencing headaches and abdominal pains while working at a job site in a plastics factory. After concluding that these symptoms were a reaction to various inhalant chemicals present at the site, Texler so informed her supervisor, Thomas Moran, and provided him with two brief letters from Dr. Richard Stahl to this effect. The Board accommodated Texler's condition to her satisfaction--mainly by allowing her to avoid assignments at certain job sites and moving her office at the center away from a print shop area--until 1986, at which time she took an extended leave of absence in order to work on a grant program in Columbus, Ohio.
 
 
 3
 While Texler was on leave, a Board task force reorganized the placement department, the division in which she worked. Upon her return in August 1987, Moran informed Texler that she would be required to perform an increased amount of on-site training, and the Board therefore could no longer excuse her from most site assignments. Texler then advised Moran that her first new assignment, at a site at which cleaning chemicals were present, posed an immediate health problem for her. After a meeting between Texler and Board Superintendent Norman Czubaj, the Board granted Texler a fourteen-day, paid leave of absence to enable her to obtain medical documentation clarifying the nature of her condition and her precise physical limitations. At the end of this period, Texler provided the Board with a letter describing her medical status from her physician, Dr. Francis Waickman.
 
 
 4
 In an effort to accommodate Texler's claimed medical needs, the Board assigned her to a special project and did not require her to perform any on-site job training. As part of this assignment, the Board gave Texler a temporary office--designated at trial as "office number one"--on the second floor of the training and work center. Because the office directly below was being painted at the time, Texler had immediate complaints regarding office number one's air quality.
 
 
 5
 In January 1988, Texler was assigned team leader management duties, which included working with other members of the staff and follow-up visits to clients' job sites. Thereafter, because the placement department's temporary authority to use office number one had expired, Moran assigned Texler to what was designated at trial as "office number two," which was located on the first floor of the center. Although Texler had expressed a desire to relocate to the first floor in 1983, she had numerous complaints regarding office number two. These included the office's proximity to a production area and individuals who smoked, and the presence of exhaust fumes from buses idling outside the center. In addition, Texler objected to her officemate, Zoe Walsh, because Walsh wore perfume and mousse, and smoked, and because a sign above Walsh's desk read "Thank you for smoking." Texler further objected to another "Thank you for smoking sign" located in a lobby area near office number two.
 
 
 6
 In June 1988, Texler applied for the formal position of master habilitation specialist. Due to concerns that Texler might be physically unable to engage in the extensive community contact this job required, the Board held the position open for her until she obtained medical documentation that she could perform all of the job's requisite duties. Maintaining that the Board was discriminating against her by not unconditionally offering her the specialist position, Texler then filed handicap discrimination complaints with the Ohio Department of Mental Retardation and Developmental Disabilities, on June 30, and with the United States Department of Health and Human Services, on July 1. In October, Texler was promoted to master habilitation specialist.
 
 
 7
 In November 1988, Texler received a schedule of planned pesticide applications in the center. Texler contends that because she was not provided with this schedule when she first requested it in April 1988, and because she was not given advance notice of planned sprayings at all of the Board's buildings, she was repeatedly exposed between July and December 1988 to pesticides that aggravated her medical condition.
 
 
 8
 Also in November of that year, in an attempt to address her complaints concerning office number two, the Board relocated Texler to a private office designated at trial as "office number three." Texler objected to this office because it was non-enclosed, lacked a window, and was too close to the production area, copier, and individuals who smoked. In the process of relocating Texler this time, the Board had offered her an office with a window, which she declined. Moreover, although there was no production work being done near the office at that time, in 1985 Texler had previously occupied office number three, without experiencing significant health problems. After she complained to Moran about the newest office assignment, Moran allowed Texler to work in any unoccupied space that she could locate within the center. The Board subsequently introduced a sign-out procedure, pursuant to which, Texler claims, she was required to sign out every time she left her desk for "more than ten minutes," and then "pumped about" her whereabouts upon her return.
 
 
 9
 In November and December 1988, the Board and Superintendent Czubaj offered to move Texler's home office from the Akron Training and Work Center to one of the Board's several other buildings. This offer was made in exchange for a resolution of the discrimination complaints Texler had filed against the Board, and as part of attempted settlements with the various government agencies whose assistance Texler had enlisted. Texler did not agree to the offer, and filed a third discrimination complaint, with the Ohio Civil Rights Commission, on December 12. After an appointment with Dr. Kathleen Fagan on December 14, Texler returned to work and requested sick leave. This request was denied, and Texler's last day of work for the Board was December 23.
 
 
 10
 Texler now maintains that her final relocation within the center, to office number three, rendered her totally disabled as of December 1988. Since February 1989, Texler has been receiving Public Employee Retirement System Benefits.
 
 II
 
 11
 On October 18, 1989, Texler filed a complaint against: (1) the Board; (2) Moran, her supervisor, in his official and individual capacity; (3) the trustees of the Board, in their official capacity; (4) Czubaj, the Board's superintendent, in his official capacity; and (5) Roger Harris, the Board's director of human resources, in his official capacity. In her complaint, Texler alleged that the Board failed to provide reasonable accommodations for her handicapping condition of multiple chemical sensitivities, thereby causing her to become disabled and unable to perform her duties as a master habilitation specialist, in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, and Ohio Revised Code Secs. 4112.02(A) and 4112.99. The Board also took actions against her, Texler maintained, in retaliation for her filing of discrimination complaints with administrative agencies, in violation of Section 504 and 45 C.F.R. Secs. 80.7 and 84.61. In addition, Texler contended that the Board's failure to accommodate her handicap constituted both intentional and negligent infliction of emotional distress. Finally, Texler argued that Moran intentionally exposed her to chemicals that he believed would exacerbate her condition, and that this conduct therefore amounted to an assault and battery.
 
 
 12
 On December 21, 1990, the district court granted a motion by defendants for summary judgment with respect to the intentional infliction of emotional distress and the assault and battery claims only. In the same order, the court also: (1) noted that Texler had conceded in her response to defendants' motion for summary judgment that her negligence claim must be dismissed; and (2) dismissed the remaining discrimination and retaliation claims against Moran in his individual capacity, based on a finding that he was entitled to qualified immunity.
 
 
 13
 A jury trial on the federal discrimination and retaliation claims, and the state discrimination claim, began on September 26, 1991. At trial, Texler's treating physicians, Drs. Fagan and Waickman, conceded on cross-examination that there is a difference of opinion within the medical community as to whether multiple chemical sensitivities is an actual condition. Moreover, Dr. Fagan testified that no objective test currently exists to determine if an individual suffers from this condition, and that Texler claimed to suffer from adverse reactions to chemicals even within her own home.
 
 
 14
 On October 2, at the close of Texler's case, the district court granted defendants' motion for a directed verdict with respect to the retaliation claim. On October 4, at the close of defendants' case, the court denied both a renewed motion by defendants, and a motion by Texler, for a directed verdict on the remaining handicap discrimination claims. These claims were then submitted to the jury along with written interrogatories. Interrogatories one and six provided, respectively:
 
 
 15
 "Do you find that Plaintiff has proven by a preponderance of the evidence that she was, during the period of August of 1987 until December 23, 1988, a handicapped individual as defined by the Rehabilitation Act of 1973?" ...
 
 
 16
 "Do you find that Plaintiff has proven by a preponderance of the evidence that she was handicapped under Ohio law during the period of August of 1987 until December 23, 1988?"
 
 
 17
 On December 11, based on the jury's negative responses to each of these two interrogatories, the court rendered judgment on both the federal and state discrimination claims for defendants. On January 23, 1992, the court denied Texler's motions for judgment notwithstanding the verdict and for a new trial. Finally, on June 26, the district court entered an order taxing $4,136.90, in payments of $50 per month, as costs to Texler.
 
 
 18
 Texler timely appealed the judgment and costs awarded to the Board and the district court's denial of her post-trial motions, and the Board timely cross-appealed the order taxing costs only.
 
 III
 A. Unlawful Retaliation
 
 19
 Texler argues that the district court erred in directing a verdict for the Board as to the claim of unlawful retaliation. In reviewing a directed verdict, this Court applies the same standard as the district court. Nida v. Plant Protection Ass'n Nat'l, 7 F.3d 522, 525 (6th Cir.1993). As we have explained:
 
 
 20
 "In considering a motion for a direct[ed] verdict under Rule 50(a), the trial court 'must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury.' As applied in this context, 'sufficient evidence' is such that, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ."
 
 
 21
 Id. (quoting Sawchik v. E.I. Du Pont de Nemours & Co., 783 F.2d 635, 636 (6th Cir.1986) (internal citations omitted)). Moreover, although Texler's retaliation claim is based upon the same employer conduct as her discrimination claims, she need not demonstrate that she was handicapped in order to prove that her employer took retaliatory action against her after she filed her discrimination complaints with the administrative agencies. Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir.1990) (as basis for retaliation claim, plaintiff need only prove that he opposed an unlawful employment practice that he reasonably believed had occurred or was occurring).
 
 
 22
 In order to prevail on a claim of retaliation, an employee must first make a prima facie showing that "she engaged in a protected activity, she was subsequently subjected by her employer to adverse employment action, and that a causal link existed between the two events." Yates v. Avco Corp., 819 F.2d 630, 638 (6th Cir.1987) (Title VII case). Once the employee has made her prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason" for the adverse employment action taken against the plaintiff. Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., 783 F.2d 50, 54 (6th Cir.) (Title VII case), cert. denied, 478 U.S. 1006 (1986). Finally, if the defendant articulates such a reason, the plaintiff then must show that the given reason is merely a pretext. Id. The question for this Court to resolve here, therefore, is whether, in light of the standards above, there was sufficient evidence such that reasonable minds could differ over whether the Board retaliated against Texler because she filed the discrimination complaints. We find, as did the district court, that there was not.
 
 
 23
 Texler initially notes, and the Board concedes, that there is no controversy over the fact that she did file the discrimination complaints. Texler thus satisfied the first element of her prima facie case. As to the second element, Texler argues that the following conduct constituted adverse employment action against her: (1) the Board's failure timely to provide her with a schedule of pesticide sprayings and her subsequent exposure to pesticides; (2) the Board's failure to remove, and thus "ratification of," the "Thank you for smoking" signs posted in and near office number two; (3) her relocation to office number three; and (4) the requirement that she sign out upon leaving her desk, and the fact that she was interrogated as to her whereabouts upon her return.
 
 
 24
 With regard to the causal connection between the protected activity and the adverse action that Texler must demonstrate to satisfy the third element of the prima facie case, Texler stresses that conduct can be shown to be retaliatory in nature either by direct evidence of hostility or by indirect evidence in the form of the timing of the employer's actions. De Cintio v. Westchester County Medical Ctr., 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965 (1987). Additionally, Texler contends that her burden with regard to this element is only to prove that retaliatory motive played some part in the Board's decision to undertake the conduct in question. Roach v. Teledyne Monarch Rubber Co., 31 Fair Empl. Prac. Cas. (BNA) 1393, 1400 (N.D.Ohio 1982). Here, Texler maintains, Czubaj's offer in the fall of 1988 to relocate her on the express condition that she agreed to withdraw her discrimination complaints constituted direct evidence of hostility. Texler believes further that the fact that, after she filed her complaints, she was relocated to office number three, exposed to pesticide spraying and the "Thank you for smoking" signs, and forced to sign in and out constitutes indirect evidence of retaliatory motive. These arguments are without merit.
 
 
 25
 As an initial matter, the conduct in question does not even appear to constitute adverse employment action. The Board, albeit after some delay, did provide Texler with a schedule of the planned pesticide sprayings, and Texler did not even contend that the "Thank you for smoking signs" were posted with the Board's approval or at the Board's behest. The Board relocated Texler to office number three, furthermore, in an effort to accommodate her concerns over the air quality in office number two. Finally, Texler has made no showing that the sign-out policy applied only to her, or even that other employees were not similarly "pumped about" their whereabouts upon returning to their respective desks.
 
 
 26
 Texler also has failed to demonstrate the causal link required as the third element of the prima facie case of retaliation. At the outset, Texler's characterization of Czubaj's offer to relocate Texler's office as an implicit threat is disingenuous at best. As the Board maintains, "To assert that an employer's desire to have all charges against it resolved when it enters into a conciliation agreement with governmental agencies constitutes evidence of a retaliatory motive would constitute an extraordinarily absurd precedent." Appellee's Brief at 11-12. Furthermore, with respect to the timing of the Board's conduct as indirect evidence of a retaliatory motive, Texler makes only a general allegation that she was treated adversely sometime after she filed the discrimination complaints. She fails, however, to explain why, following her filing of the complaints, the Board repeatedly attempted to accommodate her alleged handicap and promoted her to the position of master habilitation specialist.
 
 
 27
 Even if Texler has established a prima facie case of retaliation, she has made no showing that the Board's stated reasons for its conduct are pretextual. Most notably, she has failed to expose as pretextual the Board's claim that it relocated her to office number three in an attempt to accommodate her litany of complaints regarding office number two. Texler herself, in fact, appears unsure as to precisely how to achieve the chemically pristine environment she requires in which to work. Moreover, the fact that she prohibited the Board from communicating directly with her treating physicians only further frustrated the Board's attempts to accommodate her medical needs. Finally, the Board notes that during the fall of 1988, it was in the process of implementing a no-smoking policy within its offices, and Walsh, with whom Texler shared office number two, was attempting to quit smoking. Accordingly, the Board contends that the "Thank you for smoking" sign in the lobby area was in all likelihood posted as part of the general controversy over smokers' rights at the center, while the sign above Walsh's desk was probably posted as a joke directed solely at Walsh by one of her colleagues. Texler makes no response to this argument.
 
 
 28
 As Texler has not shown that she that she was subjected to adverse employment action because she engaged in protected activity, reasonable minds could not have found that the Board unlawfully retaliated against her. The district court, therefore, properly granted the Board's motion for a directed verdict on this claim.
 
 B. Membership in Protected Class
 
 29
 Texler maintains that the district court erred in failing to rule as a matter of law that she was a member of the protected class covered by Section 504 of the Rehabilitation Act of 1973. Because she never specifically asked the district court to rule as a matter of law that she was handicapped within the meaning of Section 504, Texler, in making this argument, must be arguing that the district court erred in failing to grant either her motion for a directed verdict or her motion for judgment notwithstanding the verdict with respect to her federal discrimination claim. This Court applies the standard of review described above, in the context of the Board's motion for a directed verdict on Texler's unlawful retaliation claim, to both of these determinations. Monette v. AM-7-7 Baking Co., Ltd., 929 F.2d 276, 280 (6th Cir.1991); see also Nida, 7 F.3d at 525 (explaining standard). Unlike in our consideration of the Board's motion on the retaliation claim, because we are now reviewing a motion by Texler we must draw all inferences from the evidence in the light most favorable to the Board. Id.
 
 
 30
 In order to establish a case of handicap discrimination under the Act, a plaintiff must prove that she is an otherwise qualified handicapped individual, that she was discriminated against by her employer, and that the discrimination against her was because of her handicap. Jasany v. United States Postal Service, 755 F.2d 1244, 1250 (6th Cir.1985). Texler must therefore show that based on the evidence adduced at trial, no reasonably-minded jury could have found either that she was not an otherwise qualified handicapped individual, that she was not discriminated against by her employer, or that the discrimination against her was not because of her handicap.* On appeal, however, Texler makes no arguments concerning the second and third elements. Thus, because Texler has not even argued that the only reasonable conclusion based upon the evidence was a verdict in her favor, her challenge to the district court's denial of her motions for a directed verdict and for judgment notwithstanding the verdict must fail.
 
 
 31
 Even if this Court were to consider solely whether the district court should have ruled that Texler was handicapped within the meaning of the Act as a matter of law, Texler's allegation of error would still lack merit. Section 504 of the Act protects otherwise qualified individuals with handicaps from discrimination solely by reason of their handicaps. 29 U.S.C. Sec. 794(a). The Act defines an individual with handicaps as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. Sec. 706(8)(B). Texler argues that regardless of whether she met the requirements of subsections (i) and (ii), the Board regarded her as having such an impairment, and thus she was handicapped within the meaning of subsection (iii). In rejecting an identical claim, however, the Seventh Circuit made clear that an employer's decision to attempt to accommodate an employee who defines herself as impaired does not dictate a finding that the employer regards the employee as handicapped as a matter of law. Byrne v. Board of Educ., 979 F.2d 560, 566-67 (7th Cir.1992). Accordingly, because reasonable minds could have differed over whether the Board regarded Texler as handicapped, the district court would not have erred in failing, if asked, to rule that Texler was handicapped within the meaning of the Act as a matter of law.
 
 
 32
 C. Intentional Infliction of Emotional Distress
 
 
 33
 Texler contends that the district court erred in granting the Board's motion for summary judgment with respect to Texler's claim for intentional infliction of emotional distress. This Court reviews a grant of summary judgment de novo. National Rifle Ass'n v. Handgun Control Fed'n, 15 F.3d 559, 561 (6th Cir.1994). As the Court noted in National Rifle:
 
 
 34
 The question on review of a summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.
 
 
 35
 Id. (citations omitted). Ohio law defines liability for the tort of intentional infliction of emotional distress as follows: " 'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.' " Yeager v. Local Union 20, 6 Ohio St.3d 369, 374 (1983) (quoting RESTATEMENT (SECOND) OF TORTS Sec. 46(1) (1965)). With respect to the requirement that the alleged conduct must be "extreme and outrageous," the Yeager court explained:
 
 
 36
 "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'
 
 
 37
 "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivilaities."
 
 
 38
 Id. at 375 (quoting RESTATEMENT, supra, Sec. 46 cmt. d). In an employment context, moreover, an actor's conduct is never outrageous where he has done no more than to insist upon his legal rights in a permissible way, even if he is aware that such insistence is certain to cause another emotional distress. Foster v. McDevitt, 31 Ohio App.3d 237, 239 (1986). As to the requirement of emotional distress, Ohio law provides that for liability to attach, "the emotional distress alleged must be serious." Yeager 6 Ohio St.3d at 374. Finally, state law places the burden on the plaintiff to prove that the defendant's actions proximately caused her alleged emotional distress. Pyle v. Pyle, 11 Ohio App.3d 31, 34 (1983).
 
 
 39
 Here, Texler claims that, given her difficulties with the air quality in each successive office to which she was assigned, both the Board's decisions to relocate her office and the Board's refusal at other times to honor her requests for relocation constituted extreme and outrageous conduct. In addition, she contends that her supervisor, Moran, berated her, wore heavy cologne, and smoked cigarettes despite his awareness of her sensitivity to smoke and her reactions to cologne. These actions, Texler maintains, also amounted to extreme and outrageous conduct. We disagree.
 
 
 40
 Although the standard for outrageous conduct can be somewhat difficult to quantify, the Board's decisions concerning the location of Texler's office do not even approach the Ohio threshold for liability. The record as presented for the district court's review on summary judgment, moreover, does not suggest that brief exposure to smoke or cologne would severely affect Texler in any way. Nor is there any indication that Moran held any such belief. Even assuming Moran intended by his conduct to harass Texler, therefore, his actions, although certainly undesirable, seem most aptly characterized only as "petty oppressions." Accordingly, we conclude that the district court did not err in granting the Board's motion for summary judgment with respect to the claim for intentional infliction of emotional distress.
 
 D. Taxation of Costs
 
 41
 Texler argues on appeal, and the Board argues on cross-appeal, that the district court abused its discretion in taxing $4,136.90 in costs, payable in $50 monthly installments, to Texler. We are not persuaded by either party's argument.
 
 
 42
 Except under circumstances not present here, Federal Rule of Civil Procedure 54(d) provides that "costs other than attorney's fees shall be allowed as a matter of course to the prevailing party unless the court otherwise directs." The types of costs that may be assessed against the losing party are enumerated in 28 U.S.C. Sec. 1920, and include fees for court reporters, witnesses, and photocopying. This Court has held that the language of Rule 54(d) "creates a presumption in favor of awarding costs, but allows denial of costs at the discretion of the trial court." White & White, Inc. v. American Hosp. Supply Corp., 786 F.2d 728, 730 (6th Cir.1986). Because Rule 54(d) establishes a norm of action entitling the prevailing party to its costs as of course, a district court's discretion to depart from the rule and deny costs is more limited than it would be if the rule were "nondirective." Id. at 731-32.
 
 
 43
 Among the factors the district court may properly consider in denying costs to a prevailing party are whether the prevailing parties taxable expenditures are unnecessary or unreasonably large, Goostree v. State of Tennessee, 796 F.2d 854, 864 (6th Cir.1986), cert. denied, 480 U.S. 918 (1987); and the losing party's inability to pay, Congregation of the Passion v. Touche Ross & Co., 854 F.2d 219, 222 (7th Cir.1988). Recently, this Court stressed that a district court's ultimate award of costs must be supported by factual findings. Phelan v. Bell, 8 F.3d 369, 375 (6th Cir.1993); see also P. Mastrippolito and Sons, Inc. v. Joseph, 692 F.2d 1384, 1388 (3d Cir.1982) (stating that a district court may not deny costs to a prevailing party without an explanation).
 
 
 44
 Here, the district court addressed seriatim the individual items claimed by the Board as costs. First, with respect to court reporter fees, the court articulated the general standards for when depositions are reasonably necessary, and taxed as costs to Texler $3,349.75 of the $7,906.18 sought by the Board in this category. In arriving at this award, the court found that the Board's three depositions of Texler were excessive, and disallowed half of the claimed cost of these depositions. The court did not, however, give specific reasons for denying half of the claimed costs for the Board's deposition of certain parties, and all of the claimed cost for the Board's deposition of various other parties. Second, with respect to witness fees, the court again articulated the general standards for the calculation of these fees, and then denied half of the Board's claimed witness fee costs without further explanation. Third, the court found the $1,921.25 claimed by the Board in photocopying fees to be "excessive," and taxed as costs in this category only $571.25. Finally, the court denied the $2,116.81 sought by the Board in LEXIS research fees, reasoning that to find such expenses taxable "would be tantamount to charging the losing party for the prevailing party's law library books."
 
 
 45
 We find that the district court did not abuse its discretion in denying, for the above reasons, a portion of the claimed photocopying costs and of the claimed LEXIS research fees. As to the district court's unexplained denial of a portion of the claimed court reporter costs and witness fees, we note that in setting a minimum payment of $50 per month in fulfillment of the order, the court emphasized Texler's "near indigency [sic]." Although we believe that Phelan makes clear the general obligation of district courts in this circuit to explain the rationale behind the denial of each item of claimed costs under Rule 54, we conclude that the district court's denial of a portion of the court reporter costs and witness fees in this case was supported by the court's explicit finding as to Texler's inability to pay. See Congregation of the Passion, 854 F.2d at 222 (court may consider losing party's inability to pay in denying costs). Thus, the district court did not abuse its discretion in awarding a portion of the claimed costs for these items.
 
 IV
 
 46
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 *
 Texler cannot sidestep this requirement by relying on the fact that the district court rendered judgment for the Board on the federal discrimination claim based solely on the jury's negative response to the interrogatory concerning whether she had shown that she is a handicapped individual. As noted above, this Court reviews the district court's denial of a motion for judgment notwithstanding the verdict de novo. Thus, we will affirm the district court's judgment for the Board, even if that court focused exclusively on Texler's handicapped status, provided that Texler has failed to meet her burden of proof on any of the three elements of her claim