**Thomas HIGGINS,**

v.

**DETROIT EDUCATION TELEVISION FOUNDATION d/b/a WTVS, Channel 56, and Public Broadcasting Service, Defendants.**

**No. 97–CV–71198–DT.**

United States District Court, E.D. Michigan, Southern Division.

April 30, 1998.

*OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO
DISMISS*

ROSEN, District Judge.

## I. INTRODUCTION

This is a copyright infringement action brought by Thomas Higgins (who also goes by the "stage name" of "Rocky Jackson") against Detroit Public Television (WTVS, Channel 56) and the Public Broadcasting Service. Plaintiff filed his Complaint in this Court on March 24, 1997.

Higgins claims to be the co-author and the holder of the copyright in a 3 minute and 35

second musical composition entitled "Under the Gun".[1] According to Plaintiff, 45 seconds of a performance of the song by the "Bradford Youth Gang" were used as background music to the introductory and ending sequences of a feature on the DEA in one episode of a Channel 56/Public Broadcasting half-hour teen-targeted TV series called *Club Connect*. Funding for the production was provided by the Corporation for Public Broadcasting, the Michigan Department of Education, and WTVS.

The *Club Connect* episode at issue was entitled "Stop the Fighting II" and was 27 minutes and 46 seconds in length.[2] Most of the show is a panel/quiz show format discussion of ways to handle dispute resolution. The show also contains several feature segments including one about staying out of street gangs, and a feature on the DEA, which lasts about 5 minutes. It was only during the DEA feature that the song "Under the Gun" is heard.

Not only was the episode shown on TV (on Channel 56 in Detroit), but also videotapes of the show were made available for purchase by educational institutions. According to Defendants, 41 videotapes of this program have been sold, the last sale having been made in June 1996.[3] Thirteen of the videotape sales were made before March 24, 1994.

Defendants do not dispute that a portion of the Bradford Youth Gang's recording of "Under the Gun" was used as background music with narration superimposed over it in the "Stop the Fighting II" episode of *Club Connect*. However, Defendants contend that their use of the song in the program and in the subsequent videos of the program which were distributed solely for educational purposes constitute "fair use" under the Copyright Act, and, therefore, is not actionable as copyright infringement. Additionally, Defendants argue that Plaintiff's claims of infringement with respect to the 13 pre-March 24, 1994 video sales are barred by the three-year statute of limitations governing copyright actions.[4]

## II. DISCUSSION

### A. THE "FAIR USE" DOCTRINE

From the infancy of copyright protection, some opportunity for "fair use" of copyright-

1. Although Plaintiff claims that his copyright of this song is registered and that he is the sole holder of the copyright, he has not provided the Court with any evidence to substantiate either of these claims. The only evidence of record indicates that the song was copyrighted by "Young Gang Music". [See Defendants' Ex. B.] Defendants, however, have not challenged Plaintiff's claim that he is the holder of a duly registered copyright of "Under the Gun". Therefore, for purposes of this motion, the Court will accept as true Plaintiff's allegations with regard to this issue.

2. Defendants contend that the song was only used in the opening sequence, and that only 16 seconds of the song were used. A copy of a videotape of the show has been provided to the Court [Ex.A to Defendants' Motion for Summary Judgment]. The Court has reviewed the video, and finds that the song at issue is barely audible and at most is played for a total of 35 seconds. Indeed, it is only during 16 seconds of the opening of the show's feature on the DEA that the song can be heard (softly) behind narration and dialogue. With respect to Plaintiff's claim that the song is also played during the closing of the DEA feature; to the extent that it is audible at all, it is only played for an additional 15–20 seconds. No lyrics are heard at all; what is heard (although very faintly) is electric guitar music.

3. All but one of these sales were to educational institutions. The one non-educational institution sale was to Plaintiff's lawyer.

4. With respect to the television broadcast of the "Stop the Violence II" episode of *Club Connect*, Defendants state that they are not required to obtain the permission of the copyright holder of musical compositions used in their broadcast programs because the Copyright Act affords public broadcasters a compulsory license permitting these broadcasters to synchronize or perform published musical compositions on non-commercial public television without obtaining prior permission from copyright holders and without negotiating rates or terms, which are set by the federal government. *See*, 17 U.S.C. § 118; 37 C.F.R. § 253.7. Defendants state that when "Stop the Violence II" was originally produced for broadcast, PBS attempted to locate "Youth Gang Music", which was listed as the copyright holder of "Under the Gun" on the Bradford Youth Gang's recording, but it was unsuccessful in that attempt. When Plaintiff Higgins contacted PBS to complain that he had learned that "Under the Gun" was used in "Stop the Violence II", PBS advised him of the § 50.46 statutory compulsory license fee available to him under 37 C.F.R. § 253.7. Plaintiff has refused to claim that fee and instead instituted this lawsuit.

ed material has been thought necessary to fulfill copyright's very purpose, "[t]o promote the Progress of Science and useful Arts...." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 575, 114 S.Ct. 1164, 1169, 127 L.Ed.2d 500 (1994), quoting U.S. Const., Art. I, § 8, cl. 8.

The fair use doctrine, codified in 1976 as a statutory exception to copyright infringement, 17 U.S.C. § 107, provides that, under certain circumstances, unauthorized copying of a copyrighted work is permissible and not actionable as infringement. As provided in the statute:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research, is not an infringement of copyright. In determining whether the use made of the work in any particular case is a fair use, the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purpose;
>
> (2) the nature of the copyrighted work;
>
> (3) the substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect on the potential market for or the value of the copyrighted work.

 Whether a use referred to in the first sentence of Section 107 is a fair use in a particular case depends upon the application of the determinative factors. *Campbell v. Acuff–Rose Music, Inc., supra,* 510 U.S. 569, 578, n. 9, 114 S.Ct. 1164, 1170, n. 9, 127 L.Ed.2d 500 (1994), quoting S.Rep. No. 94–473, p. 62 (1975) U.S.Code Cong. & Admin.News 1976, p. 5659. However, the factors enumerated in § 107 are not meant to be exclusive: "Since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising

the question must be decided on its own facts." *Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985), quoting H.R.Rep. No. 94–1476, p. 65, U.S.Code Cong. & Admin.News 1976, p. 5678; *National Rifle Association v. Handgun Control Federation of Ohio,* 15 F.3d 559, 561 (6th Cir.1994). Nor may the four statutory factors be treated in isolation, one from another. *Campbell v. Acuff–Rose Music, supra,* 510 U.S. at 577, 114 S.Ct. at 1170. All are to be explored and the results weighed together in light of the purposes of copyright. *Id.*

The Court, therefore, will examine each of the four statutory factors as they apply to the facts of this case.

1. *THE PURPOSE AND CHARACTER OF THE USE*

 The evidence of record in this case establishes that the TV program, "Stop the Violence II," and the video of that program in which "Under the Gun" was used was produced for the purpose of teaching teenagers conflict resolution and the dangers of illegal drugs. "Stop the Violence II," thus, was made for educational purposes. The video of the program was not mass marketed; rather, the distribution of the video of the program was limited to educational institutions.[5] Information on ordering the videotape was set forth at the end of the TV program and is set forth at the end of the videotape copies where it is clearly stated that a videotape of the program can be purchased "for educational use only." [See Affidavit of Dan Hamby, Senior Program Director, Program Acquisitions Learning Media of Public Broadcasting Service, ¶ 11.]

Defendants admit that 41 "Stop the Violence II" videos were sold. [Hamby Affidavit ¶ 18.] From these sales, PBS grossed $2,159.73, of which WTVS received $653.90. *Id.* According to Dan Hamby, although generally PBS makes a 6% profit on each video sold at the normal $59.95 price, in the case of

---

5. The Court notes that nowhere in the excerpts of the PBS Video catalogues submitted by Plaintiff does "Stop the Violence II" appear, nor does any other episode of *Club Connect.* The fact that other videos, including videos of commercial motion pictures, can be purchased through the PBS Video catalogue is irrelevant for purposes of determining whether "Stop the Violence II", in which Plaintiff's song is played, was made for educational purposes.

"Stop the Violence II", because of discounts and the extremely low volume of sales, PBS made no profit whatsoever from the sales of the video in this case.[6] [Hamby Affidavit, ¶ 21.] The money, if any, earned on the sale of PBS videos goes to fund other educational programs at PBS. *Id.* at ¶ 23. The fact that a charge is made for a work, or that a profit is anticipated, however, does not convert the use into a commercial one. *Wright v. Warner Books, Inc.,* 953 F.2d 731, 736–737 (2d Cir.1991); *Salinger v. Random House, Inc.,* 811 F.2d 90, 96 (2nd Cir.1987), *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987).

As the court observed in *Maxtone-Graham v. Burtchaell,* 803 F.2d 1253 (2d Cir. 1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987):

> It is undisputed that Burtchaell was paid for his efforts and that his publishers were not motivated by purely charitable intentions. But the inquiry does not end there. We do not read Section 107(1) as requiring us to make a clear-cut choice between two polar characterizations, "commercial" and "non-profit". Were that the case, fair use would be virtually obliterated, for "[a]ll publications are operated for profit." ... The commercial nature of a use is a matter of degree, not an absolute....

*Id.* at 1262 (citations omitted).

Nor, in this case, does the fact that one non-educational sale was made convert the non-profit nature of the video into a commercial one. The sole non-educational purchase of "Stop the Violence II" was made by Plaintiff Higgins' lawyer. A plaintiff may not claim to have been damaged by reason of a defendant's sale of alleged infringing copies if the copies were sold to plaintiff's agent, because such a sale prevents the distribution of

such copies to the general public. *See Nimmer on Copyright,* § 14.02[B], citing *Shapiro, Bernstein & Co. v. Bleeker,* 243 F.Supp. 999 (S.D.Cal.1965), *modified on other grounds,* 367 F.2d 236 (9th Cir.1966).

Relying on *Princeton University Press v. Michigan Document Services,* 99 F.3d 1381 (6th Cir.1996) (en banc), Plaintiff argues that while the tapes of "Stop the Violence II" might ultimately be used by the purchasers in teaching, this does not make Defendants' use one of "education" or "teaching." Plaintiff's reliance on *Princeton University Press* for this proposition is misplaced. At issue in the *Princeton University Press* case was the duplication of large portions of copyrighted materials. The copies at issue were undisputedly made "for sale by a for-profit commercial [copyshop] corporation that decided to maximize its profits, and give itself a competitive edge over other copyshops, by declining to pay the royalties requested by the holders of the copyrights." *Id.* at 1388. Copying copyrighted materials was the express business of the *Princeton University Press* defendant. It was because the defendant was in the business of making copies of copyrighted material for profit that the court refused to find an educational purpose simply because the copies made were ultimately used by university students. Defendants in this case, by contrast, are not for-profit commercial entities, nor are they in the business of making copies of copyrighted material.

As the foregoing discussion makes clear, the purpose and character of Defendants' use was a non-profit, teaching purpose. Therefore, the Court finds that this first factor weighs in favor of Defendants.[7]

This first factor also weighs in favor of Defendants because their use of "Under the Gun" was a transformative use. As the Su-

---

**6.** The Court notes that of the 41 sales of "Stop the Violence II", only 19 were at the $59.95 price. The rest were sold at discounted prices, the discounts ranging from $6.96 to $29.95.

**7.** Several courts have held that if a work falls within one of the categories set forth in section 107 (i.e., criticism, comment, news reporting, teaching, scholarship, or research), the use is considered presumptively fair. *See, Robinson v. Random House, Inc.,* 877 F.Supp. 830, 840 (S.D.N.Y.1995); *Sandoval v. New Line Cinema*

*Corp.,* 973 F.Supp. 409, 412 (S.D.N.Y.1997) ("Uses of a copyrighted work for purposes such as 'criticism, comment, news reporting, teaching ... scholarship or research' are more likely to be found fair uses than uses for commercial purposes"); *Wright v. Warner Books, Inc.,* 953 F.2d 731, 736 (2d Cir.1991) (if a work falls into one of the categories set forth in section 107 "assessment of the first fair use factor should be at an end".)

preme Court stated in *Campbell v. Acuff–Rose Music, Inc., supra,* in determining whether a defendant has made a "transformative" use of copyrighted material, the question is whether the defendant's work "adds something new, with a further purpose, or different character, altering the first with new expression, meaning or message." 510 U.S. at 579, 114 S.Ct. 1164.

> Although such transformative use is not absolutely necessary for a finding of fair use ... the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright ... and the more transformative the new work, the less will be the significance of other factors like commercialism that may weigh against a finding of fair use.

*Id.*

In *Sandoval v. New Line Cinema Corp.,* 973 F.Supp. 409 (S.D.N.Y.1997), the plaintiff's copyrighted photographs appeared in the motion picture *Seven.* The scene in which the photographs appeared was approximately one and one-half minutes in length and were obscured for the majority of the time. The court found that the film was made for commercial purposes, but stated:

> [Defendants do much more than "merely supersede the copyrighted work] by exhibiting them, however obscurely, for the first time in the film. The use of plaintiff's photographs was transformative, in the sense that defendants used the visual images created in plaintiff's work **in furtherance of the creation of a distinct visual aesthetic and overall mood for the moviegoer watching the scene** in the killer's apartment. Defendants did not use the photographs to promote *Seven,* nor is there any indication that defendants were trying to exploit directly the theoretical market for Sandoval's previously unexhibited photography."

973 F.Supp. at 413. Thus, while the court found that there was a commercial purpose, the transformative nature of the use neutralized the commercialism. *Id. See also, Campbell, supra* ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." 510 U.S. at 579, 114 S.Ct. at 1171.)

Plaintiff relies upon *Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 44 U.S.P.Q.2d 1001 (2d Cir.1997). That case involved a copyrighted work of African–American art entitled "Church Picnic Story Quilt" which was painted by the plaintiff Faith Ringgold. A licensed poster of the work was displayed for approximately 30 seconds in a five-minute scene of "ROC", a commercial television sitcom concerning a middle class African–American family. The scene involved a music recital in a church. The poster was clearly displayed in the scene as a wall hanging on a wall in the church and was seen at least nine times in the scene, several times as the focal point for the action in the scene.

Ringgold sued for copyright infringement based upon the display of "Church Picnic" in the ROC sitcom episode. The defendants argued for application of the fair use doctrine. Although the district court agreed and found fair use the Second Circuit reversed on two grounds. First, the appellate court noted that the use was clearly not for any of the purposes listed in Section 107, i.e., it was not for "criticism, comment, news reporting, teaching, scholarship or research". The work was used for commercial purposes. 44 U.S.P.Q.2d at 1008, 126 F.3d 70. Second, the court found no "transformative" use because the defendants used Ringgold's work for precisely the central purpose for which it was created—to be decorative. *Id.* The court found particularly noteworthy that the poster was the **only** decorative artwork visible in the church scene. Therefore, the court concluded that no "transformative" use existed to neutralize the commercial purpose of the use:

> Nothing that the defendants have done with the poster supplants the original or adds something new. The defendants have used the poster to decorate their set to make it more attractive to television viewers precisely as a poster purchaser would use it to decorate a home.

*Id.*

The Court sees a marked distinction between the use of the poster in *Ringgold* and

the use of "Under the Gun" in "Stop the Fighting II". First, and foremost, whereas the clear purpose of the use in *Ringgold* was commercial, as discussed above, the purpose of the use of "Under the Gun" was educational. Second, whereas the poster in *Ringgold* was used for its express decorative purpose and was clearly seen—and sometimes used as the focal point for the action in the ROC church recital scene—only two barely discernable snippets of an instrumental portion of "Under the Gun" is heard as background music in "Stop the Violence II." "Stop the Fighting II" is not a musical composition, but is instead an audio-visual program that seeks to educate teenagers about conflict resolution and the dangers of drugs. Defendants transformed a small portion of "Under the Gun" to create a distinctly new work. Moreover, Defendants did not use "Under the Gun" to promote "Stop the Fighting II", nor is the song by any means the focal point of the action. Rather, it is used only as soft background music for less than twenty seconds of drug raid footage in a 5–minute feature on the DEA, with narration and dialogue superimposed over the music, and then again, barely audible, as background music while dialogue continued in the closing moments of the DEA feature.

## 2. *THE NATURE OF THE COPYRIGHTED WORK*

■ The second "fair use" factor provides protection to works that are unpublished or that are creative or fictional. *Robinson v. Random House, Inc.*, 877 F.Supp. 830, 841 (S.D.N.Y.1995). The parties do not dispute that as a musical composition, Plaintiff's work is creative. This factor, therefore, tips in Plaintiff's favor. *Campbell v. Acuff–Rose Music, supra*, 510 U.S. at 586, 114 S.Ct. at 1175. However, this factor does not weigh heavily in Plaintiff's favor because Plaintiff's work was previously published by distribution of recordings of it. [Affidavit of Robert Rossbach, Vice President, Education and Outreach of WTVS, ¶ 11. See also, Defendants' Ex. B.] It is unpublished works that are the favorite sons of factor two. *Wright v. Warner Books, supra*, 953 F.2d at 737; *Harper & Row Publishers, Inc. v. Nation Enterprises, supra*, 471 U.S. at 564, 105 S.Ct. at

2232 (The fact that a work is unpublished is a critical element of its "nature".)

## 3. *THE AMOUNT AND SUBSTANTIALITY OF THE PORTION USED*

■ The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," are reasonable in relation to the purpose of the copying. *Campbell, supra*, 510 U.S. at 586, 114 S.Ct. at 1175. There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use. *Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir.1986). In some instances, copying a work wholesale has been held to be fair use, *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 203 Ct.Cl. 74 (1973), *aff'd* (per curiam), 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975), while in other cases taking only a tiny portion of the original work has been held unfair.

■ Questions of fair use may turn on qualitative assessments. *See e.g., Harper & Row, supra* (although the words quoted in *Nation* were an insubstantial portion of former President Ford's manuscript, "the *Nation* took what was essentially the heart of the book." 105 S.Ct. at 2233); *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 80 (2nd Cir.1997) (court of appeals found that the district court properly considered the brevity of the intervals in which plaintiff's copyrighted poster was observable in the television program and the fact that in some segments only a portion of the poster and the nearly full view was not in precise focus); *Rogers v. Koons*, 960 F.2d 301, 311 (2nd Cir.1992) ("Even more critical than the quantity is the qualitative degree of the copying: what degree of the essence of the original is copied in relation to its whole.")

Turning first to a qualitative analysis, then, the Court finds that the scales tip here in favor of Defendants. As noted above, none of the lyrics of Plaintiff's song are played in "Stop the Violence II". Moreover, the two brief 16– and 20–second long ex-

cerpts from the song are barely audible. Although an instrumental portion of "Under the Gun" is discernable behind the narration and dialog in the first 16–second segment, Plaintiff's song can barely be heard at all the second time it is played at the end of the DEA feature. This is not a case where "the heart" of the copyrighted work has been used.

Nor does a quantitative approach aid Plaintiff. Defendants used 35 seconds of Plaintiff's 3–minute–and–35–second musical composition in "Stop the Violence II". This amounts to 16% of the copyrighted work. As indicated above, in some instances, copying entire works have, nonetheless, been permitted under the fair use doctrine. *See e.g., Triangle Publications, Inc. v. Knight–Ridder Newspapers, Inc.*, 626 F.2d 1171 (5th Cir. 1980) (upholding a finding of fair use when the defendants used the entire cover of the plaintiff's publication, *TV Guide.*) *Cf., Schumann v. Albuquerque Corp.*, 664 F.Supp. 473 (D.N.M.1987) (broadcast of performance of entire copyrighted song by a commercial radio station without copyright holder's permission where the broadcast was not a news show, held not to constitute fair use.)

In contrast to the *Schumann* case, in *Keep Thomson Governor Committee v. Citizens for Gallen Committee*, 457 F.Supp. 957 (D.N.H.1978), the court found fair use in the defendants' use in their political advertisement 15 seconds, i.e., 12%, of plaintiff's three-minute long recorded song. In *Thomson*, the plaintiff's song, was performed by a musical group uninterrupted and without voice-over for approximately 15 seconds. This was followed by 45 seconds of defendant Gallen's criticism of plaintiff's candidate.

Guided by the foregoing authorities, the Court finds that, on a quantitative level, the use of 16% of Plaintiff's musical composition is not so substantial to tip this factor so as to tip this factor in favor of Plaintiff.

Therefore, the Court finds that Defendants' use of "Under the Gun" is both quantitatively and qualitatively insubstantial.

### 4. *EFFECT ON THE POTENTIAL MARKET*

■ The fourth fair use factor is "the effect of the use upon the potential market for,

or value of, the copyrighted work." The Supreme Court has said that this last factor is "undoubtedly the single most important element of fair use." *Harper & Row Publishers v. Nation Enterprises, supra,* 471 U.S. at 566, 105 S.Ct. at 2233. *See also, Princeton University Press v. Michigan Document Services, supra,* 99 F.3d at 1385.

As the Sixth Circuit noted in *Princeton University Press,*

> One test for determining market harm—a test endorsed by the Supreme Court in *Sony, Harper & Row* and *Campbell* is evocative of Kant's categorical imperative. "[T]o negate fair use," the Supreme Court has said, "one need only show that *if the challenged use 'should become widespread, it would adversely affect the potential market* for the copyrighted work.'"

99 F.3d at 1386–87, quoting *Harper & Row,* 471 U.S. at 551, 105 S.Ct. at 2225 (emphasis in original). Thus, in evaluating this factor, courts look to whether the "copying" can be used as a substitute for the plaintiff's original work. *See, Amsinck v. Columbia Pictures, Industries, Inc.,* 862 F.Supp. 1044, 1049 (S.D.N.Y.1994). In *Amsinck,* the owner of copyrighted artwork consisting of pastel-colored teddy bears brought an action against the defendant for its display in a film of the artwork on a hanging mobile. In examining the effect of defendant's use on the potential market for the plaintiff's work, the court determined:

> In this case, the defendants' use of Amsinck's artwork did not prejudice sales of her design or of the mobile bearing the design. Furthermore, the "copying" complained of—the defendants' use in a film of a mobile bearing her artwork—could not be used as a substitute for her original work. The film does not pose a threat to the market for Amsinck's work in either licensing artwork or in future sales to motion pictures. Indeed, the court believes that, notwithstanding the lack of identification of the mobile, its use in the film might actually increase the demand for mobiles, in general, thereby benefitting plaintiff indirectly.

*Id.* at 1049. *See also, Mura v. Columbia Broadcasting System, Inc.,* 245 F.Supp. 587 (S.D.N.Y.1965) (exhibition of plaintiff's copyrighted puppets on a television program would stimulate sales of the puppets rather than prejudice them and the use in the program complained of could not be deemed a substitute for plaintiff's work).

In *Italian Book Corporation v. American Broadcasting Companies, Inc.,* 458 F.Supp. 65 (S.D.N.Y.1978), a music publisher brought an action against a television broadcaster for copyright infringement alleged to have occurred when the defendant televised a parade during which music copyrighted by the plaintiff was played. In finding that the broadcaster's use of the work in question was privileged under the fair use doctrine, the court examined the effect of the use upon the potential market for the music. The court stated:

> Where the subsequent use of a protected work is not in competition with the copyrighted use, and no showing is made that such subsequent use lessens the value of the copyrighted work, the fair use defense is generally sustained....

> When these principles are applied to the case at bar, it is evident that the defense of fair use must be sustained. ABC and its evening television news program are not in competition with the plaintiff. The use which defendant made of the song in question is not competitive with the commercial use plaintiff seeks to make of the song. No loss of profit or lessening of the song's value as the result of defendant's use was demonstrated....

*Id.* at 70.

Like the *Italian Book Corporation* case, "Stop the Fighting II" does not have any effect on the potential market for "Under the Gun". The copying complained of—Defendants' use of two very short musical excerpts, without lyrics, of a recording of the song as background music in an educational video—cannot be said to be a substitution for the musical composition. Furthermore, this brief, barely audible background music use which Defendants made of the song in question is not competitive with the commercial use Plaintiff seeks to make of the song. No loss of profit or lessening of the song's value as the result of defendant's use has been demonstrated. In fact, Plaintiff has made no showing, whatsoever of any impact on future sales of the composition.[8]

Plaintiff does not dispute that he has no evidence showing that Defendants' use has affected the potential market for his song. He argues, however, that Defendants' use, without paying him any royalties or licensing fees, may affect the "value" of his composition, because it impacts upon his ability to collect royalties from other users in the future.[9] As to the effect on future royalties or licensing revenues, the Sixth Circuit stated:

> It is true ... that "a copyright holder can *always* assert some degree of adverse [e]ffect on its potential licensing revenues as a consequence of [the defendants' use].... simply because the copyright holder has not been paid a fee to permit that particular use." ... **But such an assertion will not carry much weight if the defendant has "[filled a market niche that the copyright owner] simply had no interest in occupying."** ... Where, on the other hand, the copyright holder clearly does have an interest in exploiting a licensing market—and especially where the copyright holder has actually succeeded in doing so—"it is appropriate that potential licensing revenues for photocopying be considered in the fair use analysis."

99 F.3d at 1387 (citations omitted). In *Princeton University Press,* the plaintiffs presented evidence that they had been collecting permission fees at a rate approaching $500,000 a year. *Id.* The court found that

---

8. In this regard, the Court notes that because the challenged use is of a "non-commercial" nature, the burden of proof as to market effect rests with the copyright holder. *Princeton University Press v. Michigan Document Services, supra,* 99 F.3d at 1385, citing *Sony Corp. v. Universal City Studios, Inc., supra,* 464 U.S. at 451, 104 S.Ct. at 793.

9. It does not appear that Plaintiff is addressing this argument to the telecast of *Club Connect* but rather only is addressing the video sales. This is not surprising since Plaintiff was, in fact, offered the statutory compulsory license fee to which he is entitled under Section 118 but never collected it.

the defendant copyshop was exploiting plaintiffs' market for licensing revenues by making hundreds of thousands of copies of copyrighted materials for-profit and maximized its profits by not paying any licensing or permission fees. The court noted, "If copyshops across the nation were to start doing what the defendants have been doing here, this [licensing] revenue stream would shrivel and the potential value of the copyrighted works of scholarship published by the plaintiffs would be diminished accordingly." *Id.*

Unlike the defendants' copying business in *Princeton University Press* whose activities of intentionally copying plaintiffs' copyrighted works for profit directly exploited the plaintiffs' licensing market, in this case, the Defendants use in no way competes with Plaintiff's market. The market niche that the Defendants have filled is the educational videotape niche. Clearly, Plaintiff has no interest in occupying this niche.

Plaintiff argues that musical compositions should be treated differently than literary or artistic works because royalties for performing musical compositions are what composers universally expect when they write and copyright a song. He argues, thus, that royalty payments are the "lifeblood" of musical composers. Plaintiff argues, as a general proposition, that if substantial portions of musical works could be copied without payment, and this practice became widespread, it would adversely affect the ability of composers to collect royalties from other users.

Plaintiff has cited no authority—nor has the Court found any—for his "special treatment for musical compositions" argument. Furthermore, what Plaintiff has posited is nothing more than a speculative generalized argument about musical composers, in general; he makes no specific showing as to his composition. The fact remains that Plaintiff has not demonstrated that the value of *his* copyright interest in "Under the Gun" has in any way been affected by the limited educational use of an insubstantial portion of the song by a not-for-profit entity.

For these reasons, the Court finds that, because Defendants' use of brief excerpts of a performance of "Under the Gun" has no effect on the potential market for the musical composition, factor four weighs in favor of the Defendants.

In sum, the Court finds that of the four statutory factors to be considered in determining the applicability of the fair use doctrine, only factor two—the creative nature of Plaintiff's work—weighs in Plaintiff's favor. Even this one factor, however, does not weigh heavily in Plaintiff's favor because Plaintiff had previously "published" his work. All of the other three statutory factors weigh in favor of Defendants. Therefore, the Court finds that Defendants use of "Under the Gun" is a "fair use". Accordingly, no cause of action for infringement based upon Defendants' use of the song can be maintained.

### CONCLUSION

For all of the reasons stated above,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be, and hereby is, GRANTED and this case, accordingly, will be DISMISSED in its entirety with prejudice.