**ITALIAN BOOK CORPORATION,**
**Plaintiff,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., Defendant.**

No. 75 Civ. 2384.

United States District Court,
S. D. New York.

Sept. 6, 1978.

Zissu & Harris, New York City, for plaintiff; Michael J. Zissu, New York City, of counsel.

Coudert Brothers, New York City, for defendant; Michael J. Calvey, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Italian Book Corporation ("I.B. Corp.") brought this action for copyright infringement against defendant American Broadcasting Companies, Inc. ("ABC"). The substantive law is found in Title 17, United States Code, and the Court's jurisdiction derives from 28 U.S.C.A. § 1338. ABC being a New York corporation with its principal office in Manhattan, venue is properly laid under 28 U.S.C.A. § 1400(a).

The protected work alleged to have been infringed is a song in the Italian language titled "Dove sta Zaza", with music by Giuseppe Cioffi and a text by Raffaele Cutolo. Plaintiff I.B. Corp. traces its copyright from a certificate of registration issued by the Register of Copyrights in September of 1945 to an entity called Italian Book Co. ("I.B. Co."). The work described in the certificate, designated "Class E For. 4295",[1] is titled "Le Nuove Canzoni del Maestro Giuseppe Cioffi"—in translation, "The New Songs of Maestro Giuseppe Cioffi." The work is in effect a songbook[2] containing the music and lyrics of 21 Italian songs, of which "Dove sta Zaza" is one.

The alleged infringement occurred on September 15, 1974, when an ABC television film crew, covering the annual San Gennaro Festival on Mulberry Street in the "Little Italy" section of Manhattan, filmed a parade which included a float upon which a band was playing. Portions of the band music were recorded, formed a part of the television film strip, and were played over Channel 7 news that evening. The band music included at least a portion of the song "Dove sta Zaza."

Plaintiff has stipulated[3] that defendant's broadcast of the song did not result in any actual damage to plaintiff or to the market for the work. In consequence, plaintiff's claim is limited to statutory "in lieu of" damages under 17 U.S.C. § 101(b).[4]

1. PX 2.

2. PX 12.

3. DX E.

4. That section of the Act provides:
"If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable:

* * * * * *

"(b) Damages and profits; amount; other remedies—To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement * * or in lieu of actual damages and profits, such damages as to the court shall appear to be

Mounting a series of defenses to the claim, ABC contends (1) that plaintiff has failed to prove that the work at issue was the subject of a valid, subsisting copyright at the time of the broadcast, either in favor of I.B. Co. or plaintiff I.B. Corp. as alleged successor in a chain of title; and (2) that assuming ownership of a valid copyright in plaintiff at the pertinent time, ABC's use of the protected song was privileged under the doctrine of fair use and the First Amendment to the United States Constitution.

The case was tried to the Court without a jury on a statement of agreed facts, expanded where the facts were in dispute by the evidence of witnesses and submission of documents. Able post-trial briefs have been filed and considered.

Concluding as I must that under the circumstances ABC's use of the work in question was privileged under the fair use doctrine, it follows that there was no infringement. Judgment will be entered dismissing the complaint. I do not find it necessary to reach the other questions raised by the record.

## I.

### FINDINGS OF FACT

The parties entered into a helpful statement of agreed facts. That statement is the source for the following 11 paragraphs:

1. The defendant American Broadcasting Companies, Inc. owns and operates a local television station, WABC–TV ("WABC"), which is located in New York, New York.

2. On September 15, 1974, a reporter for WABC and a film crew went on assignment to Mulberry Street in the "Little Italy" section of New York City to film and report on the San Gennaro Festival which was taking place there.

3. The reporter was Ms. Anna Bond. The film crew consisted of Herb Todd, a cameraman, John Occhiogrosso, a soundman, and Murray Hoffman, a lighting technician.

4. The San Gennaro Festival is a yearly out-door street fair which (although religious in nature) is widely renowned for its festive parade, music and vendors selling food and drink. Each year the festival attracts throngs of visitors.

5. While at the festival on September 15, 1974, the aforesaid news team filmed various activities at the festival, including portions of a parade.

6. The parade, an elaborate event, is part of the religious observance and is considered one of the most significant aspects of the festival.

7. While the news team was filming the parade they encountered and filmed a band which was on a float in the parade and which was playing music; portions of this music were recorded.

8. The film shot at the festival was processed that day and was turned over to a writer and editor for preparation for broadcast as part of that evening's regularly scheduled WABC eleven o'clock news broadcast.

9. The resulting news piece on the festival was broadcast that evening as part of the eleven o'clock news program known as "Eyewitness News." (The news program actually began after 11:00 that evening, having been delayed due to a preceding movie.)

10. Included in the news piece was film of the parade, including film of the aforesaid band; also included were portions of the aforesaid recorded music.

11. At least some of the aforesaid recorded music broadcast as part of the news piece constituted at least a portion of the work at issue herein, "Dove sta Zaza."

---

just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, * * * and such damages shall in no other case exceed the sum of $5,000 nor be less than $250, and shall not be regarded as a penalty."

Section 101(b) further provides that:
"The limitation as to the amount of recovery [shall not] apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him."

Based on the additional evidence adduced at trial, I make the following additional findings:

12. The San Gennaro Festival is an event of considerable public interest. It has been reported, in text and pictures, in the New York daily newspapers and entertainment magazines each year from at least 1971 to 1977.[5] In its issue of September 13, 1974, the year with which we are concerned, the *New York Post* observed that: "In this election year, many politicians will visit the streets of Little Italy" during the festival. The *New York Daily News* issue for the same day reported that "more than one million persons[6] are expected to visit the feast . . . ." In dispatching its television news film crew to the festival, ABC was responding to a reasonably perceived need to cover a genuinely newsworthy event.

13. Ms. Bond, directing the film crew, included the float, the band and the music because she considered the music to be an "integral part" of the film clip to be shown on the newscast, and "a very important part to add to the atmosphere of what was happening at the moment."[7] The *Daily News* article of September 13, 1974, quoted in the preceding paragraph, said that on Sunday, September 15, 1974 (the day in question) there would be "a parade and floats." Floats and bands are important parts of parades. The floats captivate the eye; the music quickens the spirit. Ms. Bond's decision to capture, preserve and demonstrate the float, band and music was that of an experienced reporter, seeking to capture in the limited time available to her the essence of the event. In consequence, ABC's recording of portions of the song "Dove sta Zaza", and its subsequent playing on the television news program, constituted an integral part of a news report on an event of public interest.

14. While prior to showing of the film clip on television the music track was synchronized with the reporter's voice,[8] that does not alter the thrust of any of the prior or subsequent findings. Such technical procedures are intended solely to make the news report more coherent.

15. ABC's employees had no advance knowledge that a band would come along on a float playing this particular song. There was no intent on defendant's part to infringe this or any other song. The filming and recording of the song as part of the television news report was wholly fortuitous, entirely uncomplicated by any prior intent on ABC's part to film that particular song. The resulting news broadcast in no manner constituted a subterfuge or cover for private or commercial exploitation. Use of the song was incidental to the overall, informative purpose of the newscast.

16. ABC's television newscast constitutes a medium and setting which were noncompetitive with the media and settings in which the song would normally be offered or used. ABC's use of the song did not, and could not, have any adverse effect upon the market for the song, the song's value, or the song itself.

17. There was no negligence in connection with ABC's use of the song.

## II.

## DISCUSSION

ABC contends that its use of "Dove sta Zaza" was privileged under the doctrine of fair use. I conclude that this defense is well founded.

Copyright owners enjoy a most significant degree of exclusivity in the use of protected works; but the right is not absolute. "Fair use" may be made of a protected work without constituting infringement. The fair use concept has been part of the law of copyright for many years,[9] although

---

5. DX F.

6. Presumably not all running for office.

7. Tr. 105.

8. Bond, Tr. 107.

9. For an early discussion of the doctrine, see Justice Story's opinion in *Folsom v. Marsh*, 9 F.Cas. No. 4,901, pp. 342, 344 (C.C.D.Mass. 1841).

its application has been vexing. *Meeropol v. Nizer*, 560 F.2d 1061, 1068 (2d Cir. 1977). In essence, the fair use doctrine confers: ". . . a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner by the copyright." *Meeropol, supra*, at 1068, citing *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir. 1966), *cert. den.*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546.

The pertinent factors underlying the doctrine are summarized by the Second Circuit in this discussion in *Meeropol* at 1069–1070:

"The purpose and character of the use of the copyrighted material, the nature of the copyrighted work, and amount and substantiality of the work used, and its effect upon the potential market for the copyrighted material are factors which must be evaluated in concert. *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1353, 203 Ct.Cl. 74 (1973), *aff'd by an equally divided court*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975) (per curiam). If the effect on the market by an infringing work is minimal, for example, far greater use may be privileged than where the market value of the copyrighted material is substantially decreased. Similarly, where use is made of underlying historical facts such use will be entitled to complete freedom but it is otherwise if there is verbatim copying of original, copyrighted material. 'The fair use privilege is based on the concept of reasonableness and extensive verbatim copying or paraphrasing of material set down by another cannot satisfy that standard.' *Rosemont Enterprises, Inc. v. Random House, Inc., supra*, 366 F.2d [303], 310."

These factors, well established in the cases, have now been codified in the revised copyright law, which became effective (without retroactive effect) on January 1, 1978.[10]

The Second Circuit also observed in *Meeropol*, at 1070, that: "A key issue in fair use cases is whether the defendant's work tends to diminish or prejudice the potential sale of plaintiff's work." A leading commentator characterizes this as the single most important factor.[11] That economics underlie all copyright law was stressed by the Supreme Court in *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954):

"The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'"

---

10. Thus 17 U.S.C. § 107 provides:

"Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
"(2) the nature of the copyrighted work;
"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
"(4) the effect of the use upon the potential market for or value of the copyrighted work."

The legislative history demonstrates that the intent of § 107 was "to restate the present judicial doctrine of fair use, not to change, narrow or enlarge it in any way." Report of the Committee on the Judiciary of the House (H.R.Rep. No. 83, 90th Cong., 1st Sess. 29–30, 32 [1967]).

11. In 2 *Nimmer on Copyright* (1976) at § 145, n. 646, it is said:

"It is believed that the actual decisions bearing upon fair use, if not always their stated rationale, can best be explained by looking to *the central question* of whether the defendant's work tends to diminish or prejudice the potential sale of the plaintiff's work." (emphasis added).

Where the subsequent use of a protected work is not in competition with the copyrighted use, and no showing is made that such subsequent use lessens the value of the copyrighted work, the fair use defense is generally sustained. *Rosemont, supra,* at 310–311 (vacating preliminary injunction granted by district court to copyright owner); *Time, Inc. v. Bernard Geis Associates,* 293 F.Supp. 130, 146 (S.D.N.Y.1968) (summary judgment granted defendant on question of liability where it appeared, *inter alia,* that subsequent publication "would, if anything, enhance the value of the copyrighted work"); *Mura v. Columbia Broadcasting System, Inc.,* 245 F.Supp. 587, 590 (S.D.N.Y.1965) (infringement complaint dismissed after trial, the district court observing: ". . . among the most important factors bearing on whether a use is a fair one, perhaps *the* most important, is whether the use tends to interfere with the sale of the copyrighted article . . . Here, if anything, the exhibition on television would stimulate sales of the hand puppets rather than prejudice them.").

When these principles are applied to the case at bar, it is evident that the defense of fair use must be sustained. ABC and its evening television news program are not in competition with the plaintiff. The use which defendant made of the song in question is not competitive with the commercial use plaintiff seeks to make of the song. No loss of profit or lessening of the song's value as the result of defendant's use was demonstrated; on the contrary, plaintiff has stipulated that the use complained of "did not result in any actual damage to the plaintiff, or to the market for said work." Def. Ex. E.

Defendant suggests, as was suggested in some of the cases cited *supra,* that the playing of the song in question on the television newscast might even have enhanced the value of the song. This latter suggestion is, perhaps, fanciful. The film clip of the San Gennaro Festival, which was exhibited to the Court at the trial, ran for only about a minute; the song being played by the float-borne band was not identified; one has some difficulty in imagining television viewers besieging music publishers the following day with demands for that catchy, unnamed tune that they had heard on the eleven o'clock newscast. But it is not necessary, to sustain the defense of fair use, to posit that the use in question redounded to the commercial benefit of the copyrighted work. It is sufficient if, as clearly appears here, the use complained of had no adverse effect upon the sales or market for the copyrighted work.[12]

The present plaintiff stresses the synchronization, in the television laboratory, of the sound of the music to the rest of the film clip before it was shown on the newscast. This technical process, clearly intended for a coherent presentation of the news item, has no effect upon the application of the fair use doctrine. "The fair use privilege is based on the concept of reasonableness," *Rosemont, supra,* at 310. It would have been unreasonable for the technicians at ABC to do anything other than they did, in preparing the film clip for inclusion in the news telecast.

It is significant that in its report on the revised copyright law, the House Committee on the Judiciary, after characterizing the "judicial doctrine of fair use" as "one of the most important and well-established limitations on the exclusive right of copyright owners," went on to quote the 1961 Report of the Register of Copyright, which listed among the examples of "the sort of

---

12. The holding in *Meeropol, supra,* the Second Circuit's most recent decision in the field, is not inconsistent with this conclusion. In *Meeropol* summary judgment for the defendant was reversed because the motion papers raised a triable issue of fact as to whether defendant's use of copyrighted letters caused plaintiffs actual economic loss. The *Meeropol* court distinguished *Berlin v. E. C. Publications, Inc.,* 329 F.2d 541 (2d Cir. 1964), *cert. den.,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33, on the ground that "in *Berlin* it was clear that the infringing parody had neither the effect nor the intent of fulfilling the demand for the original work, and that no greater amount had been appropriated than necessary." 560 F.2d at 1071. On the trial record, it is clear that the case at bar more closely resembles *Berlin* on the fair use issue. In *Berlin* summary judgment for defendant was affirmed.

activities the court might regard as fair use under the circumstances: . . . incidental and fortuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported."[13] That is precisely the situation presented by the case at bar. Defendant's defense based upon the doctrine of fair use must be sustained.

Plaintiff relies on *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), but that case does not run counter to the principles discussed *supra*. *Zacchini* involved a cause of action arising out of a right of publicity created by Ohio law. The plaintiff, an entertainer, had fashioned a "human cannonball" act which he performed at a state fair. A freelance reporter videotaped the act in its entirety, against plaintiff's express wishes. A local television station then broadcast the tape on its evening newscast. The Ohio courts considered themselves required by Supreme Court First Amendment cases to dismiss the complaint. Reversing, the five-man majority of the Court held that the First and Fourteenth Amendments did not immunize defendant from liability for infringement of plaintiff's state-law right of publicity, in circumstances where defendant "broadcast a performer's entire act without his consent," and such broadcast "poses a substantial threat to the economic value of that performance." 433 U.S. at 575, 97 S.Ct. at 2857. The case turned on narrow facts; the majority was careful to observe: "There is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment itself can be important news." *Id.* at 578, 97 S.Ct. at 2858. The three dissenters believed that the First Amendment barred the action: "Since the film clip here was undeniably treated as news and since there is no claim that the use was subterfuge, respondent's actions were constitutionally privileged." *Id.* at 582, 97 S.Ct. at 2860. The ninth member of the Court, Mr. Justice Stevens, would have remanded the case to the state court for clarification of the grounds of its decision before reaching the constitutional question.

*Zacchini* did not arise out of the copyright laws, although Justice White observed for the majority, at 576, 97 S.Ct. at 2849, that the economic considerations underlying an enforceable right of publicity and the copyright laws are similar. To the extent that the principles declared in *Zacchini* apply to the case at bar, it is clear that defendant would prevail under either the majority or minority view.

ABC, for its part, perceives in the First Amendment an alternative basis of defense to the present plaintiff's claim of copyright infringement. Since for the reasons stated the fair use doctrine, an integral part of copyright law, requires dismissal of the complaint, I need not and do not reach this constitutional question.[14]

## II.

Defendant asks that it be awarded costs, including reasonable attorneys' fees.

13. The full Committee Report appears in the Historical Note to 17 U.S.C.A. § 107.

14. The interreaction of the copyright laws and the First Amendment has given rise to comment. As ABC points out, in *Rosemont, supra*, at 311, Judges Lumbard and Hays stated in their concurring opinion:

"The spirit of the First Amendment applies to the copyright laws at least to the extent that the courts shall not tolerate any attempted interference with the public's right to be informed regarding matters of general interest when anyone seeks to use the copyright statute which was designed to protect interests of quite a different nature."

On the other hand, a footnote to Justice Stewart's majority opinion in *Zacchini* notes the argument put forward by Nimmer that "copyright law does not abridge the First Amendment because it does not restrain the communication of ideas or concepts." 433 U.S. at 577-578, n. 13, 97 S.Ct. at 2858. Where, as in the case at bar, the thrust of the suit is to obtain compensation, rather than to restrain communication, recourse to the First Amendment may be inappropriate as well as unnecessary. The copyright owner must be compensated for an infringing use. If the defendant's use is fair and reasonable, no infringement has occurred and no compensation is owing. That is the case at bar. In the resolution of such claims, the precise office to be performed by the First Amendment is not clear.

I have discretion to award attorneys' fees in cases of this nature, but decline to do so. Plaintiff's claim, while ultimately unsuccessful, was brought in good faith. I also take into consideration, as I am entitled to do, the relative financial resources of the parties. Plaintiff is a small, one-family enterprise; defendant is one of the three national networks. Neither of these factors standing alone is decisive. In combination they persuade me to require ABC to compensate its own attorneys. The judgment will provide for costs, exclusive of attorneys' fees, to be taxed by the clerk.

## III.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the matters involved in this action.

2. Defendant, by its use of the music of the song "Dove sta Zaza" during its September 15, 1974 news telecast of the San Gennaro Festival, did not infringe upon any copyright which plaintiff may have possessed in the song at that time.

3. Defendant's use of the song in the telecast was fair and reasonable, and consequently privileged under the doctrine of fair use.

4. There is no other basis in law upon which defendant may be held liable to plaintiff.

5. Judgment is granted for defendant dismissing the complaint on the merits and with prejudice, with costs, exclusive of attorneys' fees, in an amount to be taxed.

Settle judgment on five (5) days' notice.

It is So Ordered.