Christopher BYRNE, Plaintiff,

v.

BRITISH BROADCASTING CORPORATION d/b/a BBC Northern Ireland, Defendant.

No. 00CIV.3141(SHS).

United States District Court, S.D. New York.

Feb. 22, 2001.

Russell A. Smith, Eamonn Dornan, Law Offices of Russell Alexander Smith, P.C., New York City, for plaintiff.

Marcia B. Paul, Kay Collyer & Boose LLP, New York City, for defendant.

## OPINION AND ORDER

STEIN, District Judge.

Christopher Byrne brought this action against the British Broadcasting Corporation alleging that the BBC infringed his copyright in a song entitled "Fenians" (the "Song") in both the United States and the United Kingdom. The BBC now moves for: (1) partial summary judgment declaring that it did not infringe Byrne's United States copyright; and (2) dismissal of the action on the grounds of *forum non conveniens*. The motion for a declaration of non-infringement is denied because disputed issues of material fact exist on the question of whether the BBC's use of "Fenians" was a "fair use" pursuant to the Copyright Act. Its motion to dismiss the action on the grounds of *forum non conveniens* is denied because the BBC has not shown that the public and private interest factors set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), weigh "strongly in favor" of litigating in the United Kingdom.

## I. BACKGROUND

The following facts are undisputed, unless otherwise noted.

Byrne is a musician and political activist outspoken in his opposition to British involvement in the affairs of Northern Ireland. He and a co-author wrote "Fenians" in 1997, and he subsequently recorded it with his group, Seanchai. Since its publication, Byrne and his coauthor have been the sole proprietors of all rights, title and interest to the copyrights in the Song.

In 1999, the BBC decided to investigate and produce a story on an FBI investigation and subsequent arrest of four individuals in Florida on charges of smuggling guns into Northern Ireland for its news-magazine program "Spotlight." While planning the story, BBC producer Justin O'Brien decided to explore Irish–American media reaction to the investigation. To that end, O'Brien placed a call from his office in Belfast to John McDonagh, producer and host of a radio program called Radio Free Eireann, broadcast from the New York City studios of radio station WBAI. During that call, O'Brien obtained permission for a BBC crew to film a live broadcast of the radio show during which the Florida arrests would be discussed.

This telephone call was not O'Brien's first experience with Radio Free Eireann. O'Brien had been to the WBAI studio earlier in the summer during an airing of the program, and he periodically visits the program's Internet website at www.wbai-free.org/radiofreeeireann/.

WBAI uses, with permission, a portion of the Song as the musical introduction to Radio Free Eireann. O'Brien was aware from his experience as a television producer that WBAI used the Song; he was interested enough in the Song to ask McDonagh about it; McDonagh told him that "Fenians" was the theme music for Radio Free Eireann and had been so for some time.

The BBC crew, including O'Brien, traveled from Northern Ireland to the United States to obtain raw film footage for the story in early September 1999. After spending approximately two weeks in Florida, the crew traveled to New York, where they planned to attend and record the September 11, 1999 broadcast of Radio Free Eireann. During that broadcast, the BBC camera was plugged into the mixing desk of the radio station to record the broadcast audio while the BBC simultaneously filmed the interior of the studio. The BBC crew recorded "substantially all" of the September 11, 1999, broadcast, including the portion of the Song used to open the program.

After spending five days in New York obtaining footage, the BBC crew traveled to San Francisco and Miami to do further research. By the end of September, they had left the United States and returned to Belfast, where they transformed the raw footage into a story suitable for television broadcast.

The producers of the story used a technique called a "clean fade" three times in the story. A "clean fade" involves synchronizing visual images of a setting with sounds, in order to ease the viewer into a new segment of the story. The first clean fade consists of images of the Florida coast synchronized with the sound of portions of local weather reports. The second clean fade consists of images of the Miami skyline synchronized with a portion of Jimi Hendrix's "Sweet Angel." The third clean fade consists of images of the New York skyline synchronized with three seconds of drum beats and that portion of the Song that is used by WBAI as the opening music to Radio Free Eireann. This fade ends with a visual segue into the WBAI studio, where the broadcast audio portion of Radio Free Eireann is synchronized with the visual images captured by the BBC crew during the September 11, 2000, broadcast. The BBC never sought or obtained permission from Byrne or his co-author for the use of the Song in its broadcast.

The story was ultimately broadcast on television twice: once on BBC NI at 9:30 p.m. on October 5, 1999, and again on BBC Choice NI five days later. The story has never been sold or licensed for broadcast or use anywhere else in the world.

On April 25, 2000, Byrne brought this action alleging claims for copyright infringement pursuant to both United States and United Kingdom law.[1] The BBC now moves for partial summary judgment of non-infringement under United States law and dismissal of the action on the grounds of *forum non conveniens*.

## II. PARTIAL SUMMARY JUDGMENT OF NON–INFRINGEMENT

Summary judgment will be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). In determining whether a genuine dispute remains as to a material fact, the court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *See Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. *The Recording of the Song is a Prima Facie Violation of the Copyright Act.*

To establish a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright and (2) unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Copyright Act. *Twin Peaks Productions v. Publications Int'l. Ltd.*, 996 F.2d 1366, 1372 (2d Cir.1993). Among these rights are the rights to reproduce and publicly perform the copyrighted work. *See* 17 U.S.C. § 106(1), (5). It is undisputed that Byrne owns a valid copyright in "Fenians" and that the BBC's recording of it in the United States and subsequent broadcast in Northern Ireland were unauthorized. The BBC contends, however, that the "act of filming" copyrighted material, even if unauthorized, does not constitute infringement when the film is to be used for "a program or movie," and that the only possible infringement was the broadcast in Northern Ireland, which is governed by U.K. law. Byrne agrees that U.K. law governs the broadcast.

1. The complaint and subsequent amended complaint also contained a claim for defamation; that claim has been voluntarily withdrawn.

The BBC's argument is belied by the words of the Copyright Act, which provide that among a copyright owner's "exclusive rights" is the right "to do and to authorize ... reproduc[tion of] the copyrighted work in copies." 17 U.S.C. § 106. Thus, unauthorized copying is a *prima facie* infringement of a copyright owner's rights. *See, e.g., UMG Recordings, Inc. v. MP3.Com*, 92 F.Supp.2d 349, 350 & n. 1 (S.D.N.Y.2000); *A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 912 (N.D.Cal.2000). Moreover, the fact that the BBC later broadcast the Song without authorization does not transform the recording and broadcast into a unitary act of infringement. An unauthorized copying of a copyrighted work constitutes a completed act of infringement, even when the copy is made for the purpose of transmission or broadcast abroad. *See Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 991 (9th Cir.1998).

### B. *Was the Recording of the Song a "Fair Use"?*

The BBC also contends that both the unauthorized recording and the unauthorized broadcast were "fair uses" of the Song within the intendment of 17 U.S.C. § 107. Because the parties agree that U.K. law applies to the BBC broadcast in the United Kingdom—as distinct from the recording of the Song in the United States—the "fair use" analysis pursuant to section 107 that follows is confined to the BBC's recording of the Song in the United States.

The doctrine of fair use has been used since "the infancy of copyright protection" to insure that copyright promotes, rather than hinders, "the Progress of Science and useful Arts." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting U.S. Const., art, I, § 8, cl. 8). The doctrine was codified in section 107 of the Copyright Act of 1976, which lists several examples of uses protected by the doctrine, including "news reporting," and

mandates that courts consider four factors in determining whether a particular use is "fair": "(1) the purpose and character of the use, including whether such use is of a commercial nature ...; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. These four factors "guide but do not control [the] fair use analysis and 'are to be explored, and the results weighed together, in light of the purposes of copyright.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 141 (2d Cir.1998) (quoting *Campbell*, 510 U.S. at 577–78), 114 S.Ct. 1164. The burden of proving "fair use" rests squarely on the alleged infringer. *See Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 107 (2nd Cir.1998).

In the summary judgment context, courts have often noted that as a mixed question of law and fact, the issue of whether an alleged infringement constitutes fair use is usually unsuited to summary disposition. *See, e.g., Ass'n of Am. Med. Colls. v. Cuomo*, 928 F.2d 519, 524 (2d Cir.1991); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 955 F.Supp. 260, 267 (S.D.N.Y.1997), *aff'd*, 150 F.3d 132 (2d Cir.1998). Where there are no disputed issues of material fact, however, summary judgment based on the defense of fair use may be appropriate. *See, e.g., Castle Rock Entm't*, 150 F.3d at 137; *Sandoval v. New Line Cinema Corp.*, 973 F.Supp. 409, 411 (S.D.N.Y.1997), *aff'd on other grounds*, 147 F.3d 215 (2d Cir.1998); *Leibovitz v. Paramount Pictures Corp.*, 948 F.Supp. 1214, 1217 (S.D.N.Y.1996), *aff'd*, 137 F.3d 109 (2d Cir.1998).

In this case, disputed issues of material fact exist, rendering summary judgment on the BBC's fair use defense inappropriate. Each of the statutory fair use factors will be examined in turn.

### 1. *Purpose and character of the use*

The first factor set forth in the statute to consider is "the purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The two most common inquiries in analyses of this factor are whether the use was for a commercial purpose and the extent to which the use was "transformative," *i.e.,* "whether the allegedly infringing work 'merely supersedes' the original work 'or instead adds something new, with a further purpose or different character, altering the first with new … meaning [ ] or message.'" *Castle Rock Entm't,* 150 F.3d at 142 (quoting *Campbell,* 510 U.S. at 595, 114 S.Ct. 1164). The extent to which the use is transformative is "the more critical inquiry." *Id.*

■ The BBC contends that because it is a not-for-profit corporation, its use of the Song was necessarily "non-commercial," and was instead "for nonprofit educational purposes." However, "non-profit organizations enjoy no special immunity from determinations of copyright violation. The question under factor one is the purpose and character of the use, not of the alleged infringer." *Lish v. Harper's Magazine Found.,* 807 F.Supp. 1090, 1100–01 (S.D.N.Y.1992). The BBC also contends that because it recorded "Fenians" for use in a news program, its use constitutes "news reporting" within the meaning of 17 U.S.C. § 107—a "transformative" use— and, thus, it contends, the first fair use factor weighs in its favor.

■ Not all unlicensed uses of copyrighted material for inclusion in broadcasts that present material of interest to the public are protected by the fair use doctrine, even if they are labeled "news reporting" by defendants. If the purpose of the use was to entertain, rather than inform, *see Schumann v. Albuquerque Corp.,* 664 F.Supp. 473, 477 (D.N.M.1987), or if equally informative non-infringing alterna-

tives were available, *see Roy Export Co. v. Columbia Broad. Sys., Inc.,* 503 F.Supp. 1137, 1144 (S.D.N.Y.1980), then the first fair use factor tips in favor of the plaintiff. *Cf. Los Angeles News Serv.,* 149 F.3d at 994 (copying of news footage for redistribution to overseas news organizations was not fair use).

As discussed above, the overall topic of the television news story was the investigation and arrest of four Irish nationals on charges of gun running. The purpose of recording the WBAI radio program, according to O'Brien, was "to explore how the Irish–American media was reacting" to the criminal investigation. O'Brien Aff. ¶ 9. It is unclear, however, how recording the Song, as opposed to recording the on-air statements of the radio show's hosts and guests, served the BBC's stated purpose. Indeed, a reasonable jury could find, on the record as it exists so far, that recording the Song was wholly unnecessary to reporting on "how the Irish–American media was reacting" to the FBI investigation.

Moreover, there is ample evidence from which a reasonable jury could infer that the BBC's intent in recording the Song was not to gather facts on Irish–American media reaction, but to obtain music that would make the story more entertaining to viewers. As discussed above, the "clean fade" technique was used three times in the 20–minute story. These sequences involved both images and sounds that did not directly pertain to the topic of the story—the criminal investigation—but that were arguably used to make the story more appealing and entertaining to viewers. In each of the sequences, the sounds used were not the ambient sounds that accompanied the visual images as they were being filmed, but rather the work of third parties unrelated to the moment of filming, *i.e.,* the Song, Jimi Hendrix's "Sweet Angel," and weather reports from Florida broadcasters, obtained during the crew's stay in the United States. Accordingly, a reasonable jury could infer that

the crew sought to record not only footage necessary to its news reporting, but also footage, including the Song, that would entertain, rather than inform, as its primary purpose.

The BBC's reliance on the decision in *Italian Book Corp. v. American Broadcasting Cos.*, 458 F.Supp. 65 (S.D.N.Y. 1978), is misplaced. In *Italian Book Corp.*, a television news crew had recorded images of a New York street fair, the San Gennaro festival, including a portion of a parade consisting of a band on a float playing music—copyrighted by the plaintiff—for use in a news report about the festival. 458 F.Supp. at 67. That court found that the parade was "one of the most significant aspects of the festival," and that "ABC's employees had no advance knowledge that a band would come along on a float playing this particular song." *Id.* at 67–68. Thus, ABC's recording and subsequent broadcast of portions of the song was "wholly fortuitous." *Id.* at 68. In this case, in contrast, O'Brien had visited the WBAI studios before and "was . . . aware . . . that the music was closely associated with the station" before recording. Moreover, there is evidence to suggest that the BBC crew sought to record footage for entertainment, rather than news reporting, purposes. On this record, a reasonable jury could find that the BBC's recording of the Song was not "fortuitous," but a calculated attempt to obtain entertaining footage only tenuously related to its news reporting purpose.

In addition, a reasonable jury could find that even if the Song were recorded as part of an effort "to explore how the Irish–American media was reacting" to the reported investigation, there were equally informative non-infringing alternatives available. As discussed above, the on-air statements of the radio show's hosts and guests are an obvious alternative. The BBC crew presumably could also have interviewed other Irish–American media figures, or sought permission to use the work of other Irish–American artists.

In sum, the purpose and character of the use is a disputed issue of fact. At the summary judgment stage, therefore, this factor favors Byrne, the non-moving party.

2. *The nature of the copyrighted work*

The second factor set forth in section 107 of the Copyright Act to employ in determining whether an alleged infringement is a permissible fair use is "the nature of the copyrighted work." It is undisputed that "Fenians" is a creative work, and, thus, the type of work at "the core" of copyright law's protection. *See Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. The BBC, relying on Judge John S. Martin's opinion in *Baraban v. Time Warner*, 54 U.S.P.Q.2d 1759 (S.D.N.Y.2000), contends, however that because the Song has been widely disseminated, the nature of the work favors it or is neutral.

■ Unpublished works are the "favorite sons" of the second fair use factor, and where a plaintiff proves unauthorized publication of an unpublished work, this factor weighs heavily against a finding of fair use. *See Wright v. Warner Books*, 953 F.2d 731, 737 (2d Cir.1991). Previously published works, on the other hand, qualify for "far less protection" against fair use, and, therefore, even where the work is "creative," the second factor may not weigh as "decisively" in the copyright holder's favor where the work has been previously distributed. *See Baraban*, 54 U.S.P.Q.2d at 1762–63.

*Baraban* does not hold, however, as the BBC contends, that the wide dissemination of a work tips this factor in the alleged infringer's favor. Rather, *Baraban* stands for the straightforward proposition that the second fair use factor may have little significance in the context of a transformative use. *See Baraban*, 54 U.S.P.Q.2d at 1763; *see also, e.g., Castle Rock Entm't*, 150 F.3d at 143–44. Where the allegedly infringing use is minimally transformative, however, the creative nature of a copy-

righted work remains significant. *Castle Rock Entm't,* 150 F.3d at 144.

As noted above, whether the Song was recorded for a transformative purpose is a disputed issue of fact. Accordingly, the creative nature of work weighs in favor of Byrne on a motion for summary judgment.

### 3. *The amount and substantiality of the portion used*

Courts must examine the third fair use factor—"the amount and substantiality of the portion [of the copyrighted work] used in relation to the copyrighted work as a whole"—in context. *Castle Rock Entm't,* 150 F.3d at 144. "The inquiry must focus upon whether '[t]he extent of ... copying' is consistent with or more than necessary to further 'the purpose and character of the use.'" *Id.* (quoting *Campbell,* 510 U.S. at 587–87, 114 S.Ct. 1164).

The BBC recorded the entire 50–second portion of the Song used by WBAI.[2] The BBC contends that because this was no more of the Song than was necessary to reproduce the radio program in its entirety, the third fair use factor weighs in its favor. This argument assumes, however, that reproduction of the radio program in its entirety was necessary to a transformative purpose, which, as discussed above, is in dispute.

At the summary judgment stage, the Court draws the inference that no part of the recording of the Song was necessary to the BBC's asserted news reporting purpose. The third fair use factor, therefore, favors Byrne.

### 4. *Effect of the use on the market for or value of the original*

The fourth factor to be employed in determining whether the use of the copyrighted work was a fair use is "the effect of the use on the potential market for or value of the copyrighted work." The BBC

asserts that its "mere recordation ... cannot possibly have any effect on the actual or potential market" for the Song. When evaluating this fourth factor, however, the court must "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market" for the original or derivative works. *Campbell,* 510 U.S. at 590, 114 S.Ct. 1164.

As set forth above, a reasonable jury could infer that the BBC intentionally recorded the Song for the purpose of providing an audio component of a "clean fade." When a broadcaster makes an unauthorized copy of a song for such use, it has no need to purchase a copy from the copyright holder or his licensees, thus lessening the market for the song. *Cf. Los Angeles News Serv. v. Reuters Television Int'l Ltd.,* 149 F.3d 987, 994 (9th Cir.1998). Accordingly, this factor favors Byrne.

### 5. *Other factors*

Although the four statutory fair use factors are not exclusive, and courts may consider other factors, *see Castle Rock Entm't,* 150 F.3d at 146, the parties have not addressed any additional factors and the Court limits its analysis to the four statutory factors.

Considering the four statutory factors, the BBC's motion for summary judgment based on the fair use defense should be denied. The purpose and character of the BBC's use of the Song is a disputed issue of fact implicating each of the fair use factors and summary disposition is therefore inappropriate.

## III. *FORUM NON CONVENIENS*

The doctrine of *forum non conveniens* was developed to thwart "a strategy of

---

2. The BBC concedes that its recording of the Song constitutes more than a "de minimis" use. *See* Def.'s Mem. at 7. *See generally*

*Sandoval v. New Line Cinema,* 147 F.3d 215, 217 (2d Cir.1998).

forcing the trial at a most inconvenient place for an adversary." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The doctrine permits a court to dismiss an action to enable it to be re-filed in a more convenient foreign forum. *See DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 56 (2d Cir.2000); *see also Canada Malting Co. v. Paterson Steamships,* 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932). "[D]ismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

■ Whether an action should be dismissed based upon *forum non conveniens* is a discretionary determination, *see Piper Aircraft Co.,* 454 U.S. at 247, 102 S.Ct. 252; *Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir. 1998), and involves two steps: (1) determining whether there is an adequate alternate forum for the dispute; and (2) balancing the public and private interests factors set forth by the United States Supreme Court in *Gilbert* to determine "whether the convenience of the parties and the ends of justice would best be served by dismissing the action." *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 292–93 (2d Cir. 1996); *Alfadda,* 159 F.3d at 45.

### A. *An Adequate Alternative Forum Exists*

Dismissal of an action on the grounds of *forum non conveniens* is inappropriate in the absence of an adequate alternative forum "because application of the doctrine 'presupposes at least two forums in which the defendant is amenable to process.'" *Murray,* 81 F.3d at 292 (2d Cir.1996) (quoting *Gilbert,* 330 U.S. at 507, 67 S.Ct. 839); *see also Bybee v. Oper der Standt Bonn,* 899 F.Supp. 1217, 1222 (S.D.N.Y. 1995). This requirement "is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in 'rare circumstances' when 'the remedy offered by the other forum is clearly unsatisfactory.'" *Murray,* 81 F.3d at 292 (quoting *Piper Aircraft Co.,* 454 U.S. at 254 n. 22, 102 S.Ct. 252).

Byrne does not dispute that the BBC is amenable to suit in the United Kingdom, or that his remedies in the United Kingdom are both substantively and procedurally adequate. Rather, Byrne claims that the financial barriers he would face in bringing this action in either Northern Ireland or England, including the lack of a contingency-fee system in Northern Ireland, "effectively mean that the United Kingdom would be no forum at all."

The United States Court of Appeals for the Second Circuit, however, has explicitly held that a plaintiff's financial burdens, including hardships resulting from the absence of contingent fee arrangements, should be considered as one of the *Gilbert* factors only after a court determines that an alternative forum is available. *See Murray,* 81 F.3d at 292–93. Accordingly, this Court finds that the United Kingdom is an adequate alternative forum for this dispute.

### B. *Application of the Gilbert Factors*

■ In applying the public and private interest factors of *Gilbert,* the plaintiff's choice of forum is ordinarily given great deference, especially where the plaintiff has chosen its "home forum." *Piper Aircraft Co.,* 454 U.S. at 255, 102 S.Ct. 252; *Murray,* 81 F.3d at 290; *see also Bybee,* 899 F.Supp. at 1222. A foreign plaintiff's choice of forum, however, is given less deference than that of a domestic plaintiff. *See Piper Aircraft Co.,* 454 U.S. at 256, 102 S.Ct. 252; *Murray,* 81 F.3d at 290. Byrne is a United States citizen living in the United States. The BBC contends, however, that the deference ordinarily given to Byrne's choice of forum should be diminished by his dual citizenship—he is also a citizen of the Republic of Ireland—and his regular travel to, and contacts with, Northern Ireland.

The Second Circuit, however, has recently held that courts should accord the

choice of forum of foreign citizens who are legal residents of the United States the same deference as the choice of forum of United States citizens. *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 103. Certainly, then, Byrne's dual citizenship cannot diminish the deference his choice of forum will be given by this Court. Similarly, regular travel to the alternative forum does not diminish the deference given to plaintiff's choice, although it may be considered in the evaluation of the "private interests" of the parties. *See, e.g., Massaquoi v. Virgin Atlantic Airways,* 945 F.Supp. 58, 62–63 (S.D.N.Y.1996); *Sablic v. Armada Shipping Aps,* 973 F.Supp. 745, 748 (S.D.Tex.1997). Thus, in order to prevail on its motion to dismiss, the BBC must show that the balance of public and private interests is "strongly" in favor of litigating in the United Kingdom "in order to overcome the substantial weight accorded [Byrne's] choice of forum." *Bybee,* 899 F.Supp. at 1222; *see also DiRienzo,* 232 F.3d at 56 (quoting *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839).

The public interest factors include: (1) "the administrative difficulties flowing from court congestion"; (2) "the local interest in having controversies decided at home"; (3) "the interest in having the trial in a forum that is familiar with the law governing the action"; (4) "the avoidance of unnecessary problems in conflict of laws or in the application of foreign law"; and (5) "the unfairness of burdening citizens in an unrelated forum with jury duty." *Murray,* 81 F.3d at 293. None of these factors weighs heavily in favor of dismissal.

Each of the public interest factors are neutral. The parties have not demonstrated that the courts of the United Kingdom are any more or less congested than is the Southern District of New York. Moreover, both localities have an interest in having this dispute decided at home—the action involves alleged violations of the laws of both the United States and the United Kingdom based on acts that took place in each country. Courts in either country would have to apply the law of the other, and the application of the law of another English common law jurisdiction "does not impose a significant burden on this Court." *Gordon v. Long Bay (1980) Ltd.,* 94 Civ. 2141, 1995 WL 489474, at *4 (S.D.N.Y. Aug. 16, 1995). Finally, neither the United States nor the United Kingdom is an "unrelated forum," and, in addition, there is no right to a jury in this action in the United Kingdom.

The private interest factors include: (1) "the relative ease of access to sources of proof"; (2) "the availability of compulsory process for attendance of unwilling witnesses"; (3) "the cost of obtaining attendance of willing witnesses"; (4) "[i]ssues concerning the enforceability of a judgment"; and (5) "all other practical problems that make trial of a case easy, expeditious, and inexpensive—or the opposite." *Murray,* 81 F.3d at 294. As with the public interest factors, none of the public interest factors weigh heavily in favor of dismissal.

The first four factors are neutral. Documentary evidence and witnesses exist on both sides of the Atlantic. For example, while the BBC's raw footage is currently located in Northern Ireland, the records of Irish–American media outlets are in the United States. Similarly, while members of the BBC crew live or work in the United Kingdom and are presumably subject to compulsory process in United Kingdom courts, plaintiff, WBAI personnel, and plaintiff's experts all live or work within the subpoena power of this Court. There has been no showing that the cost of obtaining the attendance of willing witnesses would be significantly greater for either side in either forum, and the parties have not identified any issues relating to the enforceability of a judgment obtained in either the United Kingdom or the United States.

Although Byrne has submitted evidence that a trial in New York would be easier for him to finance because he has already obtained counsel on a contingency basis

and he already maintains a home here, the BBC has submitted evidence that Byrne regularly visits the United Kingdom. Accordingly, the fifth factor is largely neutral, or, at most, weighs slightly in favor of denying the motion to dismiss.

Waxing creative, the BBC claims that "all roads lead to Britannia," Def.'s Mem. at 34, and Byrne asserts that "there's no place like home," Pl.'s Mem. at 33. Home is where Byrne is entitled to stay absent a showing that the *Gilbert* factors weigh "strongly in favor" of dismissal. *See Bybee*, 899 F.Supp. at 1222. The BBC has failed to make such a showing. Accordingly, the BBC's motion to dismiss the complaint on the grounds of *forum non conveniens* is denied.

## IV. CONCLUSION

For the reasons set forth above, the BBC's motions for partial summary judgment of non-infringement under United States law and dismissal of the action on the grounds of *forum non conveniens* are denied.

SO ORDERED: